UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SHVETA KAKAR KURTZ, DANIEL L. KURTZ,
A.K., a minor child, and M.K., a minor child,

Plaintiffs,

-v-

DAVID HANSELL, as the Duly Appointed
Commissioner of the New York City Administration
for Children's Services, DIVISION OF CHILD
PROTECTION, NEW YORK COMPTROLLER,
CITY OF NEW YORK, YSCARY RODRIGUEZ,
individually and as a caseworker employed by ACS,
BHOJRANIE MAYGOO, as a caseworker employed
by ACS, EUNICE IWENOFU, as a caseworker
employed by ACS, BRENDA LAWSON, as an ACS case
manager/supervisor, ESPERANZA SANDOVAL, as a
supervisor in the family support unit employed by ACS,
DR. PETER FABRICANT, as a treating physician and
state actor operating under color of law, DR. MARIE
LUPICA, treating physician and state actor operating
under color of law, DR. RAMZI MARWAN SHAYKH,
as a treating physician, DR. SHARI L. PLATT, as a
treating physician and state actor operating under color of
law, DR. SHEENA RANADE, as a treating physician,
LSW KAREN GLASS, as a state actor, UNNAMED ACS
WORKERS AND EMPLOYEES 1–10, UNNAMED
EMPLOYEES AND WORKERS OF NEW YORK
PRESBYTERIAN HOSPITAL/WEILL CORNELL
MEDICAL CENTER 1–10, UNNAMED WORKERS
AND EMPLOYEES OF MT. SINAI HOSPITAL 1–10,
NEW YORK PRESBYTERIAN HOSPITAL/WEILL-
CORNELL MEDICAL CENTER, MT. SINAI
HOSPITAL, ADMINISTRATION FOR CHILDREN'S
SERVICES,

Defendants.

---

20 Civ. 3401 (PAE)

OPINION &
ORDER

PAUL A. ENGELMAYER, District Judge:

This case arises from—and challenges conduct by doctors and government officials in connection with—child-removal proceedings carried out by the New York Administration for Children's Services ("ACS").  Plaintiffs Shveta Kakar Kurtz ("Kakar") and Daniel Kurtz ("Kurtz," and together with Kakar, the "parents") are the parents of twin, infant girls, A.K. and M.K., who were born nearly two months premature.  One night while changing A.K.'s diaper, Kurtz dropped her on the floor of the family's kitchen, breaking her femur.  After the first doctor who examined A.K. failed to diagnose that injury, the parents took A.K. to a second hospital, which correctly diagnosed it.  Over the ensuing weeks, after follow-up visits at multiple hospitals, several medical workers filed reports of suspected abuse or neglect to ACS.  ACS then launched removal proceedings in New York family court, starting nine months of litigation.  During that time, the parents were either separated from M.K. and A.K. or had restrictions placed on their contact with them.  Ultimately, after the family moved for summary judgment in family court, ACS withdrew its removal petition and the family court dismissed the action with prejudice.

Plaintiffs allege that the removal proceedings resulted from an unlawful conspiracy between the medical staff who initially failed to diagnose A.K.'s broken femur, other doctors and medical institutions, and ACS, aimed at covering up the first hospital's failure to diagnose A.K.'s femur fracture and retaliating against the family for its litigiousness.  They sue the City of New York, ACS, two hospitals, and many employees of each institution under 42 U.S.C. §§ 1983 and 1985, alleging malicious prosecution, abuse of process, conspiracy, false imprisonment, and violation of their constitutional rights to family integrity and freedom of association.  They also bring claims under state law for, *inter alia*, intentional infliction of emotional distress ("IIED"), medical malpractice, loss of consortium and companionship, and defamation.

Before the Court now are four motions to dismiss: three by groups of private medical professionals ("Medical Defendants") and the fourth by the City of New York on behalf of all municipal employees and entities sued and served thus far ("Municipal Defendants"). For the reasons that follow, the Court grants those motions in part and denies them in part.

## I.   Background

### A.   Factual Background[1]

#### 1.   Parties

##### a.   Plaintiffs

Kakar and Kurtz are the biological parents of A.K. and M.K. Am. Compl. ¶¶ 8–9. A.K. and M.K. are fraternal twins who were born nearly two months premature, on June 4, 2018. *Id.* ¶ 10. Between August 2018 and May 2019, the parents were named as respondents in child-removal proceedings in New York family court, in which ACS alleged that they had abused A.K. and derivatively neglected M.K. *Id.* ¶¶ 8–10.

---

[1] This factual account draws from the amended complaint, Dkt. 55 ("Am. Compl."). *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). For the purpose of resolving the motion to dismiss under Rule 12(b)(6), the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court has also considered publicly filed documents from the underlying family-court proceedings, although not for the truth of the matters asserted in those documents. *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (citation omitted)); *Davis v. Whillheim*, No. 17 Civ. 5793 (KPF), 2019 WL 935214, at *6 (S.D.N.Y. Feb. 26, 2019) (taking judicial notice of "publicly available filings, orders, and appeals in the Family Court system"); *Lamont v. Farucci*, No. 16 Civ. 7746 (KMK), 2017 WL 6502239, at *1 n.4 (S.D.N.Y. Dec. 18, 2017) (same). Those include the removal petition, order of dismissal, and similar documents submitted by the defendants in connection with the motions to dismiss.

b.    *Defendants*

Plaintiffs have sued many people and entities.  For clarity, the Court groups them as they have grouped themselves in filing motions to dismiss.

i.    Municipal Defendants

Plaintiffs have sued ACS employees, ACS itself, the City of New York ("the City"), and others.[2]  David Hansell is the Commissioner of ACS.  *Id.* ¶ 12.  Brenda Lawson is a director of field operations for ACS and is alleged to have "made the determination to commence an emergency removal proceeding" in order to "teach [the parents] a lesson."  *Id.* ¶ 15.  Yscary Rodriguez, Bhojranie Maygoo, and Eunice Iwenofu are ACS caseworkers.  *Id.* ¶¶ 13–14, 17.  Rodriguez was the primary point of contact between plaintiffs and ACS, and worked with Maygoo.  *Id.* ¶¶ 13–14.  Iwenofu took over Rodriguez's responsibilities in October 2018.  *Id.* ¶ 17.  Plaintiffs allege that both Rodriguez and Iwenofu disagreed with ACS's decision to commence removal proceedings.  *Id.*  Lawson supervised Rodriguez.  *Id.* ¶ 15.  Esperanza Sandoval supervised Iwenofu.  *Id.* ¶ 18.

ii.    Medical Defendants

*Weill Cornell Defendants*:  New York Presbyterian Hospital/Weill Cornell Medical Center ("Weill Cornell") is a hospital on the Upper East Side of Manhattan, where the parents first took A.K. on the night of her injury because of its proximity to their home.  *Id.* ¶ 33.  Dr. Marie Lupica is an attending physician there who treated A.K. that night.  *Id.* ¶ 34.  Plaintiffs allege that she negligently failed to diagnose A.K.'s femur fracture, improperly discharged A.K., and later sought to cover up that error by reporting the parents to ACS.  *Id.* ¶¶ 34–35.  Dr. Ramzi

_____

[2] Plaintiffs also name the New York Comptroller and Division of Child Protection as defendants, but do not allege any facts about them.  In any event, as discussed below, these are not proper parties to this lawsuit.

Marwan Shaykh is a resident at Weill Cornell who also treated A.K. the same night.  *Id.* ¶ 36.

Dr. Shari Platt is the director of emergency medicine at Weill Cornell.  *Id.* ¶ 37.  Although she

never saw or treated A.K., she supervises Dr. Lupica and, after being notified of Dr. Lupica's

alleged misdiagnosis, allegedly conspired with others to cover up that error.  *Id.*

*Mt. Sinai Defendants*:  A.K. and M.K. were born at Mt. Sinai Hospital ("Mt. Sinai"),

where they remained in the neonatal intensive care unit ("NICU") for nearly two months after

their birth.  *Id.* ¶ 49.  On the night of A.K.'s injury, the parents took her to Mt. Sinai after Dr.

Lupica discharged her from Weill Cornell but A.K. continued to be in pain.  *Id.*  There, A.K. was

diagnosed with a femur fracture.  *Id.* ¶ 20.  Several days later, after the parents brought A.K.

back to Mt. Sinai for a follow-up visit, she was examined by Dr. Sheena Ranade, a pediatric

orthopedist, who administered additional x-rays to assess a potential clavicle fracture.  *Id.* ¶¶ 22–24.

Dr. Ranade is the co-author of an article published in the *Journal of the American Academy of

Orthopedic Surgeons* titled "The Role of the Orthopedic Surgeon in the Identification and

Management of Non-Accidental Trauma"; plaintiffs allege that Dr. Ranade was "predisposed" to

perceive abuse where there was, in fact, none.  *Id.* ¶ 58.  Dr. Ranade reported the parents to ACS

for suspected abuse or neglect after the August 13, 2018 visit.  *Id.* ¶ 57.

*HSS Defendants*:  Weeks later, the parents took A.K. for a single follow-up examination

at the Hospital for Special Surgery ("HSS").  *Id.* ¶ 38.  There, she was seen by Dr. Peter Fabricant.

*Id.*  Karen Glass is a social worker at HSS who also had contact with the parents and A.K. that

day.  *Id.* ¶ 41.  Dr. Fabricant later contacted Dr. Platt at Weill Cornell, an alleged "affiliate" of

HSS, to notify her about Weill Cornell's failure to diagnose A.K.'s femur fracture.  *Id.* ¶¶ 38–39.

Glass later filed a report of suspected abuse to ACS and Dr. Fabricant met with ACS, Dr. Lupica,

and Dr. Ranade on the morning that ACS ultimately commenced removal proceedings.  *Id.* ¶ 83.

### 2.    The August 8, 2018 Injury

On August 8, 2018, while changing A.K.'s diaper, Kurtz dropped her onto the kitchen floor.  *Id.* ¶ 47.  He and Kakar then walked her to the emergency room ("E.R.") at Weill Cornell, two blocks from their home.  *Id.*  They arrived at about 7 p.m.; A.K. spent the several hours in the ER.  *Id.* ¶ 48.  There, Dr. Lupica treated her for "no more than five minutes."  *Id.*  Weill Cornell conducted a CT scan of A.K.'s head, but not a full body exam "despite obvious discomfort to her lower extremities."  *Id.*  Kurtz also "had to urge the resident" to mind A.K.'s neck, which "was still in obvious pain."  *Id.*  Dr. Lupica discharged A.K. around midnight.  *Id.*

Once home, the parents noticed that A.K. was in continued pain and not moving her left leg.  *Id.* ¶ 49.  Concerned, they took her to Mt. Sinai later that night.  *Id.*  There, she was diagnosed with a femur fracture, as well as "healing" and "calcified" rib fractures, which plaintiffs allege occurred in the NICU after her premature birth.  *Id.* ¶ 50.  She was also examined by, among others, non-defendant Dr. Katherine Grimm, a pediatric-abuse specialist, who concluded there was no evidence of abuse and, on August 9, 2018, discharged A.K.  *Id.* ¶ 51.  On August 10, 2018, the parents took A.K. to their pediatrician, Dr. Laura Popper, who expressed concern at Weill Cornell's failure to diagnose A.K.'s broken femur.  *Id.* ¶ 52.

### 3.    August 13, 2018 Follow-Up at Mt. Sinai and First ACS Report

On August 13, 2018, the parents took A.K. to Mt. Sinai for a follow-up examination.  *Id.* ¶ 53.  There, she was examined by Dr. Ranade.  *Id.*  Dr. Ranade expressed concern that, in addition to the femur fracture, A.K. might have suffered a clavicle fracture.  *Id.* ¶¶ 54–55.  She also told the parents that she suspected A.K. might have brittle-bone disease, and advised them to have A.K. admitted to the E.R. for genetic testing.  *Id.* ¶¶ 55–56.  The parents heeded that recommendation; A.K. was admitted to the Mt. Sinai E.R.  *Id.* ¶ 56.

However, the parents soon learned that Dr. Ranade had contacted ACS and that A.K. would not be able to leave the hospital that day. *Id.* ¶¶ 56–57.[3]  Soon, two detectives and two ACS caseworkers—Rodriguez and Maygoo—arrived at Mt. Sinai to speak with the parents. *Id.* ¶ 61.  While A.K. remained in the hospital, the detectives and caseworkers, along with the parents, went back to the family's home to perform an inspection. *Id.* ¶ 62.  There, they spoke with the family's 24-hour live-in baby nurse, who corroborated Kurtz's account of how A.K.'s injury had occurred on August 8, 2018. *Id.*  The detectives left, and never contacted the family again. *Id.* ¶ 63.  ACS's Rodriguez stated that, although she had few concerns, the matter would have to remain open for 60 days, during which time she would periodically visit the home. *Id.* Between August 14 and 30, 2018, she did so, without event. *Id.* ¶ 65.  On August 14, 2018, Dr. Grimm interviewed the parents, conducted further tests, and was left with no suspicion of abuse or neglect. *Id.* ¶ 64.  A.K. was then discharged from Mt. Sinai. *Id.*

#### 4.    August 23, 2018 Follow-Up at HSS

On August 23, 2018, the parents took A.K. for a second follow-up examination, this time at HSS, where she was examined by Dr. Fabricant. *Id.* ¶ 68.  He took an x-ray and concluded that A.K.'s femur was healing well. *Id.*  He also informed the parents that he was a mandatory reporter and would have to report the injury to ACS. *Id.* ¶ 69.  After the parents told him that ACS had already been contacted, Dr. Fabricant responded that, in that case, he would need only to access Mt. Sinai's medical records. *Id.*  The parents agreed to authorize such access, and met with Glass, a social worker at HSS, to sign a medical release. *Id.*

---

[3] Plaintiffs allege that those x-rays did not show additional fractures or injuries, including to A.K.'s clavicle, but elsewhere state that the results were "inconclusive." *Id.* ¶¶ 25, 59, 105.

### 5.     August 27-29, 2018 Email Chain and Second ACS Report

On August 27, 2018, Dr. Fabricant wrote Dr. Platt at Weill Cornell to give her a "heads up" that Weill Cornell had apparently failed to diagnose A.K.'s injury. *Id.* ¶ 70.  He asked whether, in fact, the treating doctor had solely focused on "head trauma," rather than the broken femur and, if so, whether it was "perhaps a systems issue that could be addressed?" *Id.*  Dr. Platt responded, confirming that it was "a definite miss" and that she had "educated her attending," *i.e.*, Dr. Lupica. *Id.* ¶ 71.

However, Dr. Platt soon emailed again.  In that follow-up, she forwarded Dr. Lupica's response to her.  Dr. Lupica there claimed that, having reviewed the Mt. Sinai records that Dr. Platt had apparently sent her, "there was no way that the baby had that injury when [I] saw him," given that "I watched him for 4 hours." *Id.* ¶¶ 73–74.[4]  Dr. Lupica also stated that the femur break seemed "as though it required brute force of pressure to break," and that "child abuse seems to be the diagnosis now." *Id.* ¶ 75.  In response, HSS social worker Glass emailed back that she "HIGHLY recommend[ed] for [Weill] Cornell to contact the ACS worker and share [Dr. Lupica's story]." *Id.* ¶ 77.  Dr. Fabricant agreed, recommending that Dr. Lupica "talk with the ACS worker." *Id.* ¶ 78.

On August 28, 2018, Glass contacted Rodriguez and the ACS-mandated reporter line, filing a report of suspected child abuse based on the August 8, 2018 injury. *Id.* ¶ 79.  On August 29, 2018, Dr. Platt responded on the email chain, describing the parents as "dangerous," thanking Glass and Dr. Fabricant for "partnering" with Weill Cornell, and asking them to let her know if they needed to "collaborate" further. *Id.* ¶ 80.  On August 30, 2018, Dr. Lupica wrote to the email chain, confirming that she had spoken with an ACS caseworker. *Id.* ¶ 81.

---

[4] Plaintiffs note that Dr. Lupica, in this email, misidentified A.K.'s gender.  They also allege that Dr. Lupica's claim to have spent four hours with A.K. in the E.R. was a lie.  Am. Compl. ¶ 74.

### 6.      ACS's Investigation and Commencement of Removal Proceedings

On August 28, 2018, after Glass made her report to ACS, two ACS caseworkers arrived at the hotel where the parents were staying while their apartment underwent repairs. *Id.* ¶ 92. They informed the parents that they were there as a result of a separate report by Dr. Fabricant. *Id.* ¶¶ 93–94.  The parents reacted with astonishment, anger, and outrage, admonishing the caseworkers for announcing themselves as child-protective services at the hotel reception.  *Id.* ¶ 95.  On August 29, 2018, Rodriguez visited the parents again, informing them that a family support conference ("FSC") had been scheduled for the next morning at 10:30 a.m.[5]

On August 30, 2018, ACS held an FSC, at which the parents, their family, and many friends testified in support of the parents. *Id.* ¶¶ 99–100.  It was cut short, however, when Brenda Lawson, representing ACS, stated that ACS was recommending removal and intended to take the matter to family court that afternoon. *Id.* ¶ 101.  Kakar alleges that, the same morning, she learned from an unidentified source that Lawson had been "livid" about the parents' treatment of ACS's caseworkers at the hotel on August 28, 2018, and had been overheard stating, "Who do they think they are? . . .  Just because they are rich lawyers. . . .  I will show them."  *Id.* ¶ 102.

The same day, ACS filed, in New York family court, a petition to terminate parental rights.[6]  The Petition's addendum, which set forth the Petition's factual basis, stated that Dr.

---

[5] Plaintiffs allege that FSCs are expected to seek to maintain intact families and pursue solutions other than removal.  Am. Compl. ¶ 98.

[6] The Amended Complaint characterizes the petition as an "emergency petition," but the petition is not styled as such.  The protective order issued that day, citing "exigent circumstances and allegations in the petition" and entitled "ORDER (Directing Temporary Removal of Child-After Petition Filed)," was issued by a court, after a preliminary hearing, pursuant to N.Y. Fam. Ct. Act. § 1027, which does not provide for emergency removal.  *See* Dkt. 100 ("Ridgeway Decl."), Exs. A ("Petition"), C ("Removal Order"); *cf.* N.Y. Fam. Ct. Act § 1024 ("Emergency Removal Without Court Order").

Ranade had reported that A.K. "presented with injuries to her collarbone," and that the x-rays she took "came back inclusive."[7]  *Id.* ¶ 105.  It also cited Dr. Lupica's claim that, when she examined A.K. on August 8, 2018, "there [was] no way that the baby had a leg fracture," given that she "was moving her arms and legs," and that her medical opinion was that A.K.'s injuries did not occur as Kurtz had reported.  Petition at 6–7.  It did not disclose Dr. Grimm's prior assessment that "this was an unfortunate accident for a premature baby," that "both clavicles looked the same" from the x-rays, and that "no one can testify at this time that this infant was abused," despite evidence that Lawson had spoken with Dr. Grimm twice on August 14, 2018.  Am. Compl. ¶ 109; *see id.* ¶ 108 (Dr. Grimm reporting that a "clavicle fracture has not been confirmed by radiology and when I saw the baby, she lifted both arms spontaneously").

Also on August 30, 2018, the family court, with Judge Frias-Colon presiding, held a preliminary hearing on the ACS Petition.  *Id.* ¶ 106.  ACS's attorney represented at the hearing that A.K. "does have a collarbone fracture," which had been confirmed by x-rays, despite the above evidence, allegedly in ACS's possession, to the contrary.  Am. Compl. ¶ 106.  According to the hearing transcript, doctors Lupica, Fabricant, and Ranade had met with ACS that morning to, as plaintiffs characterize it, "press the case" for removal.  *Id.* ¶ 83.  After the hearing, the family court issued an order directing A.K.'s temporary removal from the family home, because she "has presented with injuries and allegations of physical abuse were made with no plausible explanation given."  Removal Order at 1.  The court directed that A.K. and M.K. be temporarily placed with Rahul Kakar, their maternal uncle, pending the removal proceeding.  *Id.*; Am. Compl. ¶ 117.

---

[7] The Amended Complaint notes that the results of the August 13, 2018 x-rays were, in fact, "inconclusive," not "inclusive."  Am. Compl. ¶¶ 25, 105.

### 7.    Post-Removal Events

Between August 30 and October 2, 2018, A.K. and M.K. resided with their uncle on Long Island.  Am. Compl. ¶ 117.  The family court then modified its order to allow Kakar's mother, who moved from India to New York City "on a moment's notice," to assume custody of the children while living in plaintiffs' home and sleeping on their floor.  *Id.*  At no point were the parents permitted to be alone with either daughter.  *Id.* ¶ 118.

On September 10, 2018, the parents took A.K. for a follow-up appointment with Dr. Ranade, accompanied by their live-in baby nurse.  *Id.* ¶¶ 120, 124.  There, they confronted Dr. Ranade about her "misleading" ACS report; Dr. Ranade recommended that they see another doctor, but the parents stated that, given the ACS proceeding, they had no choice but to remain with her.  *Id.* ¶ 122.  After the appointment, Dr. Ranade reported to ACS that the parents had brought A.K. to the appointment unsupervised.  *Id.* ¶ 123.  The plaintiffs allege this was wrong, and that the baby nurse waited in the reception area while the parents met with Dr. Ranade.  *Id.* ¶ 124.  On October 4, 2018, at another follow-up visit with Dr. Ranade, she ordered x-rays of A.K.'s clavicle to look for "healing fractures," which the parents did not authorize  *Id.* ¶ 125.

On October 30, 2018, ACS's Rodriguez and Iwenofu visited the parents and A.K., and told the parents they did not agree with their supervisors and "did not believe this was an abuse case."  *Id.* ¶¶ 127–28.  Yet Iwenofu stated, if the parents wanted to see the case resolved, they would likely have to admit to some neglect.  *Id.* ¶ 129.  She also stated that she "had never seen a case discharged without 'someone taking the blame.'"  *Id.*

On December 4, 2018, the parents gave ACS and the family court four affidavits—one from Dr. Grimm, one from the family's pediatrician, and two from doctors with whom ACS had consulted "for over a decade"—each concluding that (1) the femur fracture was consistent with an accidental fall, not abuse; (2) any rib fractures were consistent with bone fragility due to

11

premature birth; and (3) there was no "conclusive" evidence of a clavicle fracture on August 13, 2018.  *Id.* ¶¶ 136–40.  After reviewing these reports, the family court judge's clerk counseled ACS that it "may want to reconsider its position."  *Id.* ¶ 141.

On January 9, 2019, ACS stated that it was seeking to retain a neutral expert, and if the expert agreed there was no abuse, they would withdraw the petition.  *Id.* ¶ 155.  At a February 4, 2018 hearing, ACS represented that its expert, Dr. Hoffman-Rosenfeld, had reviewed all of Mt. Sinai's and HSS's medical records.  *Id.* ¶ 158.  But it soon became clear that that statement was untrue, as ACS had instead sent her the August 27–30, 2018 email chain between the HSS Defendants, Dr. Platt, and Dr. Lupica, and not other actual medical records.  *Id.* ¶¶ 159–62.

At a February 6, 2018 hearing, ACS's position began to soften.  It stated that Dr. Hoffman-Rosenfeld "cannot state physically what happened at this time," and that she would need to interview the parents and conduct physical examinations of A.K. and M.K.  *Id.* ¶ 163.  In response, Judge Frias-Colon remarked that this substantial reversal gave her "some concern about the decision to have filed this as an abuse case as opposed to being truly what everyone said from the beginning which was a tragic accident."  *Id.* ¶ 167.

On April 10, 2019, the parents moved for summary judgment in the removal proceeding. *Id.* ¶ 172.  On May 2, 2019, Dr. Hoffman-Rosenfeld concluded that A.K.'s femur break "could have resulted from a fall," that the "rib fractures are consistent with fractures related to metabolic bone disease of prematurity," that the healing timeline comported with their occurrence before discharge from the NICU, and that, after "review of the radiology, no clavicle fracture was identified."  *Id.* ¶ 175.

On May 7, 2019, ACS withdrew its Petition.  *Id.* ¶ 176.  The same day, the family court dismissed it with prejudice.  *Id.*

### B.      Procedural History

On May 1, 2020, plaintiffs filed the Complaint, Dkt. 1, and on May 5, 2020, the

Amended Complaint.  Dkt. 55.  On August 14, 2020, the Mt. Sinai Defendants filed a motion to

dismiss, Dkt. 89, and a memorandum of law in support, Dkt. 89-1 ("Mt. Sinai Mem.").  The

same day, the HSS Defendants filed a motion to dismiss, Dkt. 93, and a memorandum of law in

support, Dkt. 97 ("HSS Mem.").  On August 18, 2020, the Municipal Defendants filed a motion

to dismiss, Dkt. 99, along with a memorandum of law in support, Dkt. 101 ("City Mem."), and

the declaration of Thais. R. Ridgeway, Esq., with supporting exhibits.

On August 19, 2020, the Court issued an order directing plaintiffs either to amend their

complaint or oppose the pending motions to dismiss, and noting that no further opportunities to

amend would be given.  Dkt. 102.  On September 16, 2020, the Court granted the Municipal

Defendants' request that their motion also apply to the claims against Commissioner Hansell,

who had not been served at the time they filed their motion.  Dkt. 110.  On September 23, 2020,

the Weill Cornell defendants filed a motion to dismiss, Dkt. 112, and a memorandum of law in

support, Dkt. 114 ("Weill Cornell Mem.").  The same day, the Court again notified plaintiffs of

their right to amend and stated that no further opportunities to do so would ordinarily be granted.

Dkt. 115.

On November 13, 2020, plaintiffs opposed the motions to dismiss.  Dkt. 123 ("Pl. Opp'n"),

and filed the declaration of Robert Del Col, Dkt. 123-1 ("Del Col Decl."), and exhibits.  On

December 10, 2020, the HSS Defendants and Weill Cornell Defendants replied.  Dkts. 126

("HSS Reply"), 129 ("Weill Cornell Reply").  On December 29, 2020, the Mt. Sinai defendants

replied.  Dkt. 133 ("Mt. Sinai Reply").  On January 13, 2020, the Municipal Defendants replied,

Dkt. 136 ("City Reply").

## II.      Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145.  That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678.  Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III.      Discussion

Plaintiffs—the parents and their minor daughters—claim here that ACS's child-removal action, and the reports of child abuse by the Medical Defendants that prompted it, resulted from an elaborate conspiracy between all named defendants to deprive plaintiffs of their constitutional rights.  The Medical Defendants, they allege, sought to cover up Weill Cornell's failure to diagnose A.K.'s femur fracture by concocting spurious reports of child abuse that shifted blame away from Weill Cornell.  And ACS, they allege, relying on those false reports and lacking probable cause, launched removal proceedings that it was ultimately forced to abandon, in retaliation for the parents' litigiousness and hostility toward ACS's caseworkers.  The result, they allege, was a nine-month ordeal in which the parents were forcibly separated from their newborn twin daughters and, once reunited, subjected to unjustified restrictions on their association with them.

14

Based on this version of events, plaintiffs bring three sets of federal claims: under § 1983, for malicious prosecution, abuse of process, conspiracy, intentional deprivation of constitutional rights, and false imprisonment, against all defendants; under § 1985, for conspiracy, against all defendants; and for the deprivation of constitutional rights against the City of New York, based on, *inter alia*, an alleged custom and practice of commencing child-removal proceedings without probable cause, actionable under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).[8]  Plaintiffs also bring state-law claims for malicious prosecution, abuse of process, loss of consortium and companionship, and IIED, against all defendants; for medical malpractice against the Weill Cornell Defendants and Dr. Ranade; and for defamation against Dr. Platt, Dr. Ranade, and Glass.

In response, the Medical Defendants, across three separate motions to dismiss, argue that the Amended Complaint does not plausibly allege either that they are state actors or that they conspired with any state actor, and so they cannot be sued under § 1983.  They also argue that, even if state actors, they are immune to liability for reporting suspected child abuse in their roles as mandatory reporters of such abuse.  Finally, they contend that plaintiffs fail to plausibly allege the elements of any of their causes of action.  The Municipal Defendants, too, urge dismissal of all claims against them.[9]  First, they assert that several defendant entities are not proper parties to this action.  Second, they argue that none of plaintiffs' causes of action states a claim.

---

[8] Confusingly, plaintiffs purport to bring a *Monell* claim against all defendants.  The *Monell* doctrine, however, relates uniquely to § 1983 claims against municipal entities.

[9] With a narrow exception, these defendants do not argue that they are entitled to qualified immunity.  Their opening brief cursorily referenced such a defense, solely as to plaintiffs' conspiracy claims, but this argument was not developed until their reply—and, even then, only in a single paragraph.  *See* City Mem. at 19; City Reply at 6.  "It is well established, of course, that arguments first raised in reply briefs are forfeited or waived."  *Chevron Corp. v. Donziger*, 325 F.

The Court first addresses whether plaintiffs have improperly sued certain non-suable entities. Then, the Court considers plaintiffs' federal claims under §§ 1983 and 1985. Finally, the Court addresses plaintiffs' state-law claims.

### A.     Proper Parties

The Municipal Defendants first argue that plaintiffs' claims against ACS, the New York Comptroller, and the Division of Child Protection must be dismissed because, by statute, they are not suable entities. That is correct. *See* N.Y. City Charter, Ch. 17 § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."); *Graham v. City of New York*, 869 F. Supp. 2d 337, 348 (E.D.N.Y. 2012) ("ACS is an agency of the City of New York and cannot be sued independently."); *Emerson v. City of New York*, 740 F. Supp. 2d 385, 395–96 (S.D.N.Y. 2010) (same). Plaintiffs are silent in the face of this motion. *See Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08 Civ. 442 (TPG), 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage, where review is limited to the pleadings, a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim.").

Accordingly, the Court dismisses ACS, the New York Comptroller, and the Division of Child Protection.[10]

---

Supp. 3d 371, 379 (S.D.N.Y. 2018). And qualified immunity provides an affirmative defense, as to which defendants have the burden of proof. *Se McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004). The Court thus will not consider these arguments on the present motion to dismiss.

[10] The latter entity, the Division of Child Protection, is named (although not discussed) in the Amended Complaint. Plaintiffs appear not to have served that entity, despite the Court's having several times extended the deadline to effect service, *see* Dkts. 106, 119, which has now passed. This independently warrants its dismissal. *See* Fed. R. Civ. P. 4(m); *Zapata v. City of New York*, 502 F.3d 192, 197 (2d Cir. 2007) (dismissal under Rule 4(m) appropriate even where plaintiff

### B.       Federal Claims

#### 1.       State Action

At the threshold, each group of Medical Defendants argues that they cannot be liable under § 1983 because they are not state actors.  *See* Mt. Sinai Mem. at 5–9; HSS Mem. at 11–15; Weill Cornell Mem. at 8–12.  Plaintiffs concede that, as a matter of law, the mere reporting of a crime or child abuse to the authorities does not typically rise to the level of state action.  But, they argue, the Medical Defendants went beyond reporting, and became active participants in ACS's child-removal proceedings, so as to make them state actors subject to liability under § 1983.  On this issue, the Court holds with the Medical Defendants.

"An essential element of a § 1983 claim is that the defendant act under color of state law."  *Mortimer v. City of New York*, No. 15 Civ. 7186 (KPF), 2018 WL 1605982, at *12 (S.D.N.Y. Mar. 29, 2018).  Section 1983 thus generally applies to public officers, not private citizens.  However, in certain circumstances, private actors can be considered to have acted "under color of state law."  *See Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002).  For purposes of § 1983,

> the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate" ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)); *see Ciambriello*, 292 F.3d at 324 ("[A] private actor acts under color of state law when the private

---

would be time-barred from bringing renewed action).  Contemporaneous with this decision, the Court is issuing an order as to plaintiffs' claims against other non-served defendants.

actor 'is a willful participant in joint activity with the state or its agents.'" (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970))).

With near uniformity, courts in this Circuit have applied these principles to hold that "reporting suspected child abuse alone does not constitute state action." *J.C. v. Mark Country Day Sch.*, No. 03 Civ. 1414 (DLI) (WDW), 2007 WL 201163, at *3 (E.D.N.Y. Jan. 23, 2007) (collecting cases); *Topolski v. Wrobleski*, No. 13 Civ. 872 (LEK), 2013 WL 5652724, at *1–3 (N.D.N.Y. Oct. 16, 2013) (allegations that private actors falsely reported child abuse in effort to commence child-removal proceedings insufficient to plead state-actor status); *Ogunbayo v. Montego Med. Consulting P.C.*, No. 11 Civ. 4047 (NGG) (CLP), 2012 WL 6621290, at *12 (E.D.N.Y. Sept. 18, 2012) (report of suspected child abuse not state action where no allegation that "ACS influenced the substance of the medical defendants' evaluation"), *adopted as modified*, 2012 WL 6625921 (E.D.N.Y. Dec. 19, 2012); *Mione v. McGrath*, 435 F. Supp. 2d 266, 272 (S.D.N.Y. 2006) (hotel employees who reported suspected child abuse to authorities, leading to initiation of neglect proceedings, not state actors under § 1983); *Storck v. Suffolk Cnty. Dep't of Soc. Servs.*, 62 F. Supp. 2d 927, 941 (E.D.N.Y. 1999) (doctors who "reported their suspicions of child abuse pursuant to a state statute" not state actors); *Deckon v. Chidebere*, No. 93 Civ. 7965 (LMM), 1995 WL 555684, at *4 (S.D.N.Y. Sept. 19, 1995), *aff'd*, 101 F.3d 1393 (2d Cir. 1996); *cf. Est. of Keenan v. Hoffman-Rosenfeld*, No. 16 Civ. 0149 (SFJ) (AYS), 2019 WL 3410006, at *19 (E.D.N.Y. July 29, 2019) (holding, at summary judgment, that hospital defendants were not state actors where they allegedly "'conspired with each other to advance a false narrative and took advantage of the plainly incompetent [Child Protective Services] workers' to cause the Protective Proceedings to be brought against the Parents"), *aff'd*, 833 F. App'x 489 (2d Cir. 2020); *Estiverne v. Esternio-Jenssen* ("*Estiverne III*"), 910 F. Supp. 2d 434, 444 (E.D.N.Y. 2012) (holding, after

trial, doctor not state actor where she did not "play[] any role—other than to provide her medical opinion—in the decision to file a petition for removal").

The Medical Defendants argue that they similarly were private actors who simply reported suspected abuse to ACS. Plaintiffs respond that the facts alleged show the Medical Defendants to have gone beyond their role as mandatory reporters and "exert[ed] undue influence to obtain a desired outcome." Pl. Opp'n at 24. They rely on the following allegations. First, Dr. Ranade had x-rays of A.K.'s clavicle taken on August 13, 2018, at the follow-up visit during which she contacted ACS, after admitting A.K. to the E.R. for the ostensible purpose of taking genetic tests. Am. Compl. ¶ 59. Second, Glass, Dr. Fabricant, Dr. Lupica, and Dr. Platt engaged in discussions over email that ostensibly reflect a conspiracy to falsely report child abuse to ACS. In that thread, Dr. Fabricant first wrote to Dr. Platt to notify her that Weill Cornell appeared to have failed to diagnose A.K.'s broken femur and to ask if that failing was indicative of any "systems issue" that could be remedied. *Id.* ¶ 70. Dr. Platt responded that "it was a definite miss" and that she had "educated" Dr. Lupica. *Id.* ¶ 71. Then, however, Dr. Lupica responded to Dr. Platt (in a response that Dr. Platt forwarded to Dr. Fabricant and Glass) that she did not believe A.K. had had those injuries when she saw "him," and that she now suspected abuse. *Id.* ¶¶ 72–75. Apparently believing Dr. Lupica's story, the others then agreed that she should report to ACS; then, she and others did so. *Id.* ¶¶ 77–81. Third, without supporting allegations, plaintiffs contend that Dr. Fabricant, Dr. Ranade, and Dr. Lupica met with ACS on August 30, 2018, to "press the case for [A.K.] and [M.K.] to be removed from their parents' care," and that ACS filed its removal petition the same day. *Id.* ¶ 83. Last, they state that on September 10, 2018, Dr. Ranade falsely reported the parents for bringing A.K. to see her alone, and on October 4, 2018, took unauthorized investigatory x-rays. *Id.* ¶¶ 120–25.

These allegations do not make any of the Medical Defendants state actors.

As to Dr. Fabricant, Dr. Platt, and Glass, the Amended Complaint does not allege more than that they, apparently believing Dr. Lupica's story, decided it was appropriate to report the suspected abuse to ACS, as required under N.Y. Soc. Serv. Law § 413.  In fact, the Amended Complaint largely depicts Dr. Fabricant and Dr. Platt as open to recognizing, and addressing, Weill Cornell's lapse in failing to diagnose A.K.'s fracture.  *See, e.g.*, Am. Compl. ¶¶ 70–71. Glass merely reported to ACS, *see id.* ¶ 79, and Dr. Platt does not even appear to have done that much.  And Fabricant's meeting with ACS—along with Dr. Lupica and Dr. Ranade—on August 30, 2018, which is described only in vague terms in the Amended Complaint, as alleged did not entail more than furnishing ACS with a medical assessment based on his observations of A.K. and the parents.  *See id.* ¶ 83.  Fabricant is not alleged to have urged ACS to take specific action. The Amended Complaint states that, at that meeting, Fabricant "press[ed] the case" for removal, but that conclusory allegation is unsupported by any concrete facts.  It cannot be relied upon for purposes this motion.  *Id.*

The allegations about Dr. Lupica, taken as true, are of a different character.  She is alleged to have lied about A.K.'s condition at the time she examined A.K. on August 8, 2018, with the goal of shifting attention from her errant diagnosis, and the consequence of giving the false diagnosis of a later act of child abuse.  According to the Amended Complaint, Dr. Lupica's statement that A.K. could not possibly have had a femur fracture when she saw her on August 8, 2018, was deliberately false.  *See id.* ¶ 75.  Although some allegations as to this act are conclusory, *see, e.g.*, *id.* ("This was a slanderous fiction made up by Defendant Lupica"), the overall facts alleged as to this point are concrete enough to make the parents' claim of such a falsehood plausible.  For example, the Amended Complaint alleges that, despite only seeing A.K.

for five minutes on August 8, 2018, Dr. Lupica later falsely reported spending four hours with her. *Id.* ¶ 74. And although A.K. is female, Dr. Lupica stated that she watched "him" for that entire four-hour period, calling into doubt her claim of such a long, or of an attentive, observation. *Id.* Moreover, the circumstances of the email exchange—that Dr. Lupica's superior, Dr. Platt, had emailed her to "educate" her as to her significant "miss"—provides a plausible motive for Dr. Lupica to dissemble: to cover up her own malpractice. Claiming that A.K.'s femur had not been broken when she examined the child deflected blame and changed the narrative from a faulty diagnosis to a later act of child abuse. *See, e.g.*, *id.* ¶ 75. The Amended Complaint's allegation is thus well-pled that Dr. Lupica falsely claimed that A.K.'s injuries were not present when she examined her on August 8, 2018, and that the parents' account of how such injuries occurred was inconsistent with her diagnosis.

But this falsehood, while exposing Dr. Lupica to potential liability under state law, *see infra* pp. 46–47, does not make her a state actor under § 1983. *See, e.g.*, *Moreno v. Town of Greenburgh*, No. 13 Civ. 7101 (VB), 2014 WL 3887210, at *3 (S.D.N.Y. June 9, 2014) (no state action where defendant provides "false and misleading" information to prosecutors "even if the information provided is deliberately false"); *Rodriguez v. Winski*, 973 F. Supp. 2d 411, 429 (S.D.N.Y. 2013) ("[E]ven assuming that [defendant] had deliberately provided false information to police, such provision alone is not sufficient" to make him a state actor); *Vazquez v. Combs*, No. 04 Civ. 4189 (GEL), 2004 WL 2404224, at *4 (S.D.N.Y. Oct. 22, 2004) ("But merely filing a complaint with the police, reporting a crime, requesting criminal investigation of a person, or seeking a restraining order, *even if the complaint or report is deliberately false*, does not give rise to a claim against the complainant for a civil rights violation." (emphasis added)). Rather, "one's motivation is irrelevant to the determination of whether one is a state actor." *Shapiro v.*

*Goldman*, No. 14 Civ. 10119 (NRB), 2016 WL 4371741, at *11 (S.D.N.Y. Aug. 15, 2016)

(quoting *Young v. Suffolk County*, 705 F. Supp. 2d 183, 196 (E.D.N.Y. 2010)).  Indeed, in a similar

context, a court in this District has held that doctor not a state actor under § 1983 even though he

had been hired by ACS in connection with a neglect proceeding and "knowingly provided false

information to ACS."  *Emanuel v. Griffin* ("*Emanuel I*"), No. 13 Civ. 1806 (JMF), 2013 WL

5477505, at *5–6, 7 (S.D.N.Y. Oct. 2, 2013).  Thus, even taking as true plaintiffs' allegation that

Dr. Lupica scurrilously lied about A.K.'s injuries to cover up her failure to diagnose A.K.'s

broken femur, that does not show that she acted under color of state law.

Finally, as to Dr. Ranade, plaintiffs argue that her reporting of suspected abuse or neglect,

taking of x-rays, and follow-up reports to ACS make her a state actor because she became "part

of the reporting and enforcement machinery" of the state.  *See* Pl. Opp'n at 24 (quoting *Estiverne*

*v. Esternio-Jenssen* ("*Estiverne II*"), 833 F. Supp. 2d 356, 367–68 (E.D.N.Y. 2011)).  For

the reasons above, Dr. Ranade's reporting, both before and after August 13, 2018, does not make

her a state actor.  That is so even though she had multiple contacts with ACS.  *See, e.g.*, *Est. of*

*Keenan*, 2019 WL 3410006, at *19 ("Additional input and updates from the Northwell

Defendants as CPS's source for medical information regarding Lana's case, which presented a

dynamic situation, does not morph the Northwell Defendants from private actors into persons or

entities acting under color of state law[.]").  As to Dr. Ranade's admission of A.K. to the E.R. on

August 13, 2018, courts have recognized that private medical entities' *detention* of children, for

the purposes of conducting abuse investigations, can sometimes amount to state action.  *See, e.g.*,

*Kia P. v. McIntyre*, 235 F.3d 749, 756–57 (2d Cir. 2000) (finding state action based on hospital's

"discrete and distinguishable role in the complex relationship among the State, the parent and the

child in determining the safety and propriety of releasing [a child] to the care of her mother");

*J.C.*, 2007 WL 201163, at *2–3 (discussing *Kia P.* and finding no state action where school reported suspected abuse, but did not detain child). But plaintiffs' § 1983 claims do not focus on A.K.'s brief, August 13, 2018 stay at Mt. Sinai pending ACS's investigation. And even were Dr. Ranade considered a state actor with respect to that isolated incident, that would not convert her other actions—including making reports to ACS—into state action. *See Kia P.*, 235 F.3d at 757 (hospital was state actor only as to period where it lacked medical reason for detaining child). Finally, that Dr. Ranade took unauthorized x-rays on October 4, 2018, allegedly to check for "healing fractures," does not make her a state actor. *See* Am. Compl. ¶ 125. Plaintiffs do not plead that Dr. Ranade ever reported the results of those x-rays to ACS, or that they had anything to do with the removal proceedings that, by then, had been pending for several months.

Nor does the Amended Complaint plausibly allege that the Medical Defendants participated in a § 1983 conspiracy with ACS. *See Ciambriello*, 292 F.3d at 324–25 (private actors may be liable under § 1983 where plaintiffs show "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages"). Plaintiffs rely on the email thread between Glass and Drs. Fabricant, Platt, and Lupica to establish this conspiracy. *See* Pl. Opp'n at 12–14 (discussing Am. Compl. ¶¶ 69–82). But even assuming those communications established an agreement between those individuals to act unlawfully—rather than a conversation in which others were persuaded in good faith by Dr. Lupica's allegedly false claim that her original diagnosis had been correct—plaintiffs do not allege that ACS participated in that discussion. The principal alleged communications between ACS and the Medical Defendants were: (1) the reports of suspected child abuse reviewed above; and (2) the August 30, 2018 meeting between Lawson at ACS and Drs. Ranade, Fabricant, and Lupica. As to the former, such reporting cannot

establish a § 1983 conspiracy, even if the reporting were false. *See, e.g.*, *Rodriguez*, 973 F. Supp. 2d at 429 ("[E]ven assuming that Mr. Morrissey had deliberately provided false information to police, such provision alone is not sufficient to form the basis of a conspiracy claim."). As to the latter, the Amended Complaint lacks concrete allegations, beyond the fact of this meeting, to show an agreement between those defendants at any point. Its allegations on this point are conclusory. *See* Am. Compl. ¶ 114 ("Plaintiffs allege that Defendant Lawson was complicit in the 'Weill Cornell/Ranade/HSS conspiracy'" (emphasis removed)). In fact, the only concretely pled communication from ACS to any private defendant is ACS's report to Glass that "there was no reason to remove [A.K.] . . . as the [Parents'] story was consistent with injuries as reported by Mt. Sinai." *Id.* ¶ 77. Instead, the Amended Complaint alleges that, after receiving *additional* reports of suspected child abuse, and meeting with the reporting doctors, ACS independently decided to commence removal proceedings.[11] That ACS did so after receiving those reports, even if those reports were false, does not plausibly suggest any conspiracy.

---

[11] In opposition, plaintiffs rely on a single case. *See* Pl. Opp'n at 17–19 (discussing *Estiverne II*, 833 F. Supp. 2d at 356–57). But it is far afield. There, plaintiffs sought to hold a single doctor—the head of a hospital's "child protective services team"—liable under § 1983 because she had been "the driving force behind ACS's decision to initiate removal proceedings." *Estiverne II*, 833 F. Supp. 2d at 369–70. The supporting evidence was that the doctor had "recommended removal of [the child], that she diagnosed [the child's] injuries as consistent with being 'grabbed and shaken,' that if she had not made such a diagnosis, Infant Plaintiffs would not have been removed from their home, that ACS always follows the recommendations of [this doctor], and, perhaps most importantly, that ACS made the decision to file a petition 'in unison' with [the doctor] and the [hospital's] Child Protection Team." *Id.* at 369. Here, plaintiffs do not allege, except conclusorily, that any Medical Defendant recommended removal, that ACS "always," or has ever, followed any of their recommendations, or that—aside from the meeting on August 30, 2018—ACS decided to file a removal petition "in unison" with them. In fact, the Amended Complaint alleges that ACS, far from being driven by any Medical Defendant, had a preexisting motive to seek the children's removal. *See* Am. Compl. ¶¶ 110–15. And the removal petition belies that any Medical Defendant urged removal. *See* Petition at 6–7 (basing removal petition solely on medical assessments by Medical Defendants); *see also Estiverne III*, 910 F. Supp. 2d at 444 (finding, after trial, doctor not a state actor because ACS, not she, decided to petition for removal and doctor provided only medical opinion). *Estiverne* is thus inapposite.

Accordingly, the Amended Complaint does not plausibly allege any Medical Defendant to have been a state actor.  The Court thus dismisses the § 1983 claims against these defendants.[12] The Court next turns to plaintiffs' federal claims against persons and entities which undisputedly were state actors.

### 2.    Malicious Prosecution

To prevail on a § 1983 claim for malicious prosecution, "a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law."  *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (citations omitted).  "To establish a malicious prosecution claim under New York law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Stampf v. Long Island R.R.*, 761 F.3d 192, 198 (2d Cir. 2014) (quoting *Manganiello*, 612 F.3d at 161).  Under § 1983, state "tort law serves only as a source of persuasive authority rather than binding precedent in defining these elements."  *Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018).  A plaintiff must also show "a seizure or other perversion of proper legal procedures implicating [his] personal liberty and privacy interests under the Fourth

---

[12] Inexplicably, the Amended Complaint also names Dr. Shaykh as a defendant in all six federal claims, even though its only allegation is that he, like Dr. Lupica, failed to diagnose A.K.'s femur fracture. *See* Am. Compl. ¶¶ 36, 287–301.  There is no allegation that Dr. Shaykh ever spoke with anyone at ACS, had any contact with any government official, or took any action conceivably supporting § 1983 liability of any kind.  The § 1983 claims against him are also therefore dismissed.  The Amended Complaint's grapeshot approach—casting wide claims of illegality well beyond what the facts could remotely bear, as exemplified by the senseless inclusion of Dr. Shaykh as a § 1983 defendant—is regrettable.  The Court expects more responsible lawyering as the case moves forward.

Amendment." *Id.* at 24 (quoting *Washington v. County of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004)).

### a. Civil vs. Criminal Proceedings

Most commonly, a claim for malicious prosecution arises from a criminal proceeding. The HSS Defendants thus argue that plaintiffs do not state a claim, because the family court proceeding was civil and plaintiffs have not pled "special damages." *See* HSS Mem. at 19.  The Second Circuit has stated, however, that "our case law does not forbid a § 1983 malicious prosecution claim premised on a civil or administrative proceeding." *Washington*, 373 F.3d at 317.  To bring a malicious prosecution claim arising from a civil action in general, a plaintiff must make "a showing of some interference with plaintiff's person or property . . . by the use of such provisional remedies as arrest, attachment, replevin or injunction, . . . or other burden imposed on plaintiff beyond the ordinary burden of defending a law suit." *McCaul v. Ardsley Union Free Sch. Dist.*, No. 11 Civ. 5586 (VB), 2012 WL 1898897, at *3 (S.D.N.Y. May 3, 2012), *aff'd*, 514 F. App'x 1, 4 (2d Cir. 2013) (summary order).  Relevant here, the Circuit has noted "that the law in our Circuit is unsettled as to whether child removal proceedings can give rise to a federal claim for malicious prosecution of a parent." *Walker v. City of New York*, 621 F. App'x 74, 76 (2d Cir. 2015) (summary order); *see also McCaul*, 514 F. App'x at 4–5 (discussing without resolving whether neglect proceeding could give rise to a malicious prosecution claim).

Absent definitive Circuit guidance, the weight of authority suggests that the removal of a child from her parents, via civil family court proceedings, implicates sufficient constitutional interests to support a malicious prosecution claim. *See, e.g.*, *Cornejo v. Bell*, No. 04 Civ. 341 (BMC), 2008 WL 5743934, at *12 (E.D.N.Y. May 19, 2008) ("[T]he removal of Cornejo's son is sufficient to meet that threshold."), *aff'd*, 592 F.3d 121 (2d Cir. 2010); *Providencia V. v. Schutlze*, No. 02 Civ. 9616 (LTS), 2007 WL 1582996, at *5 n.3 (S.D.N.Y. May 31, 2007) ("[T]he removal

26

of Plaintiffs' son is sufficient to meet the threshold for applicability of this doctrine.") (collecting cases); *Yuan v. Rivera*, 48 F. Supp. 2d 335, 349 (S.D.N.Y. 1999) ("[D]epriving Ms. Chi of the custody of her children for several months reaches this threshold."). *But see Walker v. City of New York*, 63 F. Supp. 3d 301, 317 n.12 (E.D.N.Y. 2014) ("It is likely that no plaintiff in this action can even state a claim for a malicious prosecution as the 'Adult Plaintiffs have not been seized, and Infant Plaintiffs have not been prosecuted.'" (quoting *Estiverne II*, 833 F. Supp. 2d at 380)). Here, A.K. and M.K. were removed from their parents' custody for more than a month, and the parents' access to their children was highly restricted for eight more months. That impingement is substantial enough to support a claim for malicious prosecution. Accordingly, the Court will not dismiss plaintiffs' § 1983 malicious prosecution claim solely because it arises from a civil proceeding.

### b.    Initiation of Proceedings

The Municipal Defendants do not dispute that they initiated proceedings against the parents. They briefly contend that the Amended Complaint erroneously attributes prosecutorial decision-making to Brenda Lawson. City Mem. at 12; City Reply at 9–10. But "individuals other than the agent who actually prosecutes the action can be held liable for malicious prosecution." *Emanuel I*, 2013 WL 5477505, at *7. Such liability can exist when the non-prosecuting individual "played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000) (citation omitted). Here, the Amended Complaint plausibly alleges that Lawson recommended removal and caused the removal action to be commenced. *See, e.g.*, Am. Compl. ¶¶ 101–02, 110–14. Thus, plaintiffs have plausibly pled that she, and potentially other ACS caseworkers, were among those who initiated the proceedings.

c.      *Favorable Termination*

Under § 1983, unlike New York law, "[p]roceedings are 'terminated in favor of the accused' only when their final disposition is such as to indicate the accused is not guilty." *Lanning*, 908 F.3d at 26 (quoting *Singleton v. City of New York*, 632 F.2d 185, 193 (2d Cir. 1980)). "A termination is not favorable to the accused . . . if the charge is withdrawn or the prosecution abandoned pursuant to a compromise with the accused." *Rothstein v. Carriere*, 373 F.3d 275, 286 (2d Cir. 2004) (citation omitted).

The Municipal Defendants argue that, because ACS withdrew its petition and the parents consented to that withdrawal, the action was "abandoned pursuant to a compromise," leaving the guilt or innocence undetermined. City Mem. at 9 (citing *Rothstein*, 373 F.3d at 286). In their reply, they also argue that ACS's withdrawal was in the "interest of justice," and so cannot qualify as favorable termination. *See Lanning*, 908 F.3d at 28–29 ("[W]here a dismissal in the interest of justice 'leaves the question of guilt or innocence unanswered[,] . . . it cannot provide the favorable termination required as the basis for [that] claim." (quoting *Hygh v. Jacobs*, 961 F.2d 359, 367–68 (2d Cir. 1992)); *see Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995). Plaintiffs respond that, as pled, there was no compromise, and that ACS withdrew its petition because it lacked evidence of liability. The Court holds with plaintiffs.

First, neither the Amended Complaint nor the cognizable records of the family court proceedings reflect any compromise on plaintiffs' part. Rather, as pled, after plaintiffs produced evidence of their innocence of child abuse, *see* Am. Compl. ¶¶ 136–41, and moved for summary judgment, *id.* ¶ 172, and after ACS's own expert concluded that the facts on which the removal petition had been based could not be confirmed, *id.* ¶¶ 174–75, ACS moved to withdraw its case against the parents, with prejudice, *id.* ¶ 176; *see* Del Col Decl., Ex. 2 ("Withdrawal Tr.") at 2–3. In that context, plaintiffs' consent to ACS's dismissal does not bespeak a lack of favorable

termination.  As pled, plaintiffs could not have received a more favorable resolution.  In fact, at the hearing on ACS's petition to withdraw its removal action, its lawyer embraced ACS's experts' conclusion as meriting dismissal.  Withdrawal Tr. at 3 ("When we filed this petition we do believe that we had a basis to file, but based on the medical report that was provided to counsel and Your Honor's Court Attorney yesterday, we were able to speak with our independent expert.  And after she reviewed all documents we, at this time, do believe that it would be—[t]hat we are asking to withdraw the petition.").  These statements show, "in so many words," that plaintiffs were entitled to a dismissal on the merits—not that the withdrawal reflected a compromise or settlement.  *McKenzie v. City of New York*, No. 17 Civ. 4899 (PAE), 2019 WL 3288267, at *14 (S.D.N.Y. July 22, 2019); *see Mortimer v. Wilson*, No. 15 Civ. 7186 (KPF), 2020 WL 3791892, at *11 (S.D.N.Y. July 7, 2020) (denying summary judgment to defense where "the dismissal was because the prosecution determined that it would not be able to prove that C.S. was guilty of the charged crimes").

Second, the Municipal Defendants rely on *Lanning* to suggest that a "dismissal in the interest of justice . . . preclude[s] a finding that the neglect proceeding was 'terminated in Plaintiffs' favor.'"  City Reply at 3.  But that case is distinct.  It involved a procedural dismissal "in the interest of justice" under N.Y. Crim. Proc. Law § 170.40, which does not apply here.  *See Lanning*, 908 F.3d at 23.  And although the Municipal Defendants depict plaintiffs as claiming the family court action was dismissed in the "interest of justice," City Reply at 2–3, plaintiffs have not so stated, here or in the cognizable family court records.  *See* Withdrawal Tr.; Dkt. 100-21 ("Order of Dismissal").  More fundamentally, *Lanning* declined to find a favorable termination not only because the dismissal arose under section 170.40, but also because, as to some claims, jurisdiction lacked, and as to others, the state court stated that the dismissals were "'neither an acquittal of the charges nor any determination

of the merits,' but rather 'le[ft] a question of guilt or innocence unanswered.'" 908 F.3d at 28. Here, in contrast, the circumstances of ACS's withdrawal reflect plaintiffs' innocence.

> ### d.    Probable Cause

The Municipal Defendants next argue that the existence of probable cause to commence the removal proceeding, and the family court's initial grant of a temporary order of protection removing A.K. and M.K. from the parents' custody, defeats plaintiffs' malicious-prosecution claim. Plaintiffs counter that both decisions—ACS's to begin removal proceedings, and the family court's to grant an order of protection—rested on falsehoods, without which there was not probable cause. Although the question is close, plaintiffs are correct that, on the standards governing a motion to dismiss, the facts do not establish probable cause.

"[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). "In the context of a malicious prosecution claim, probable cause under New York law is 'the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of.'" *Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994) (citation omitted). "It is a more exacting standard than the standard required to support an arrest." *Emanuel v. Griffin* ("*Emanuel II*"), No. 13 Civ. 1806 (JMF), 2015 WL 1379007, at *8 (S.D.N.Y. Mar. 25, 2015). However, "[b]ecause obviously less in the way of grounds for belief will be required to justify a reasonable [person] in bringing a civil rather than a criminal suit, when the underlying action is civil in nature[,] the want of probable cause must be patent." *Emanuel I*, 2013 WL5477505, at *8 (quoting *Fink v. Shawangunk Conservancy, Inc.*, 15 A.D.3d 754, 790 (3d Dep't 2005)).

"[T]he issuance of a temporary injunction or similar judicial recognition of the merit of the underlying case creates a presumption of probable cause and places upon the plaintiff the

burden of pleading facts sufficient to overcome it." *Emanuel II*, 2015 WL 1379007, at *9

(quoting *Butler v. Ratner*, 210 A.D.2d 691, 693–94 (3d Dep't 1994)); *see also Boyd v. City of*

*New York*, 336 F.3d 72, 76 (2d Cir. 2003) (presumption of probable cause created in criminal case

by grand jury indictment).  That presumption "is rebuttable, and may be overcome by evidence

establishing that the police witnesses 'have not made a complete and full statement of facts . . . [,]

that they have misrepresented or falsified evidence[,] . . . or otherwise acted in bad faith.'" *Boyd*,

336 F.3d at 76 (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82–83 (1983)).  But to succeed

on a malicious prosecution claim after an indictment or other judicial imprimatur, a plaintiff

"must establish that the indictment was produced by fraud, perjury, the suppression of evidence

or other police conduct undertaken in bad faith." *Id.* (quoting *Colon*, 60 N.Y.2d at 83).  In the

context of child-removal proceedings specifically, one court has held that the presumption of

probable cause arising from a removal order may be rebutted where the petition for removal

"was either intentionally or recklessly false, as the result of defendants' conduct." *Estiverne II*,

833 F. Supp. 2d at 379.  In assessing probable cause, courts "must consider those facts available

to the officer at the time of" her actions.  *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006).

 The facts pled and otherwise cognizable here give the Municipal Defendants a solid basis

to argue that probable cause existed.  As of August 30, 2018, when ACS commenced removal

proceedings in family court, it had received two reports of potential child abuse about A.K.  As

reflected in the Petition, on August 13, 2018, Dr. Ranade had reported that, along with a broken

femur, A.K. "presented with injuries to her collarbone," which contradicted the parents' account

of how A.K.'s injuries had occurred.  Am. Compl. ¶ 105.  In addition, around August 30, 2018,

Dr. Lupica reported to ACS that, when she had seen A.K. on August 8, 2018, A.K. did not have

the femur fracture with which she was ultimately diagnosed, and that, based on the Mt. Sinai and

HSS x-rays, she did not believe the injuries occurred in the manner or at the time the parents had claimed. According to the Amended Complaint, Glass and Dr. Fabricant had also contacted ACS caseworkers with similar concerns. *Id.* ¶ 79. After receiving these reports, on August 30, 2018, ACS commenced removal proceedings. *See* Removal Order at 1–2. That ACS's petition was granted by a family court judge after a hearing also gives rise to a rebuttable presumption of probable cause. *See, e.g.*, *Boyd*, 336 F.3d at 76; *Emanuel II*, 2015 WL 1379007, at *9.

Plaintiffs, however, have pled sufficient facts, at this preliminary stage of the litigation, to rebut that presumption. To do so, plaintiffs must show that the relevant government officials have not made a complete statement of facts, have misrepresented or falsified evidence, or have otherwise acted in bad faith. *Boyd*, 336 F.3d at 76. A showing that defendants' submissions to the family court were "intentionally or recklessly false, as the result of defendants' conduct," can meet this standard. *Estiverne II*, 833 F. Supp. 2d at 379.

Here, although the contrary outcome is entirely possible, plaintiffs have plausibly pled that the Municipal Defendants, in seeking the infants' removal, included materially false statements and were reckless in presenting information to the family court. As plaintiffs emphasize, before August 30, 2018, although ACS did not reveal this to the court, *no* doctor had diagnosed A.K. with a clavicle fracture. Dr. Ranade had affirmatively disavowed a conclusive diagnosis of such a fracture, and Dr. Grimm appears to have concluded that A.K. did not even have a clavicle *injury*. *See* Am. Compl. ¶¶ 105 (Dr. Ranade told ACS that x-rays from August 13, 2018 were "inconclusive."), ¶¶ 108–09 (Dr. Grimm stated on August 14, 2018, that "[a] clavicle fracture has not been confirmed by radiology and when I saw the baby, she lifted both arms spontaneously," and informed ACS's Lawson that she reviewed the x-rays "and saw that both clavicles looked the same."). ACS's notes from August 14, 2018 confirm that a positive

diagnosis had not been made. *See id.* ¶ 105. Yet, when ACS filed its removal petition on August 30, 2018, it affirmatively claimed that the August 13, 2018 x-rays had been "inclusive" of clavicle injuries. *Id.*; *see also* Petition at 7. Conceivably, that awkward locution as to this key point could stem from a mere error in typing "inconclusive," but the Court cannot assume this on a motion to dismiss. In any event, plaintiffs plead that, at the hearing on the petition, ACS doubled down on this false claim and represented that A.K. "does have a collarbone fracture," that x-rays had "confirmed the collarbone fracture," and that "[m]ost medical doctor staff were able to take x-rays and were able to see that there was also a collarbone fracture." Am. Compl. ¶ 106. Those statements, as pled, were recklessly false, and had no basis in the records or reports before ACS at the time.

These falsehoods, as pled, were consequential. The Removal Order expressly relied on that aspect of the Petition, citing the presence of *multiple* unexplained injuries as the family court's basis for granting the application. *See* Removal Order at 1. And ACS's own expert, reviewing the same radiological evidence nine months later, ultimately concluded that "no clavicle fracture was identified," proximately leading ACS to withdraw its petition, with prejudice. *Id.* ¶¶ 175–76. To be sure, discovery may well reveal that these were errors made in good faith, or that evidence not now cognizable or apparent buttressed ACS's claim, at the time, of a clavicle fracture.[13] But on a motion to dismiss, the Court must draw all inferences in plaintiffs' favor. *See Koch*, 699 F.3d at 145. Given that standard, the Court cannot find as a

---

[13] It is possible, too, that, after discovery, the Municipal Defendants will prove entitled to qualified immunity. *See, e.g.*, *Cornejo v. Bell*, 592 F.3d 121, 129 (2d Cir. 2010) (affirming grant of qualified immunity to ACS caseworkers at summary judgment); *Walker*, 621 F. App'x at 76. They did not, however, move to dismiss on this ground. And bad faith, if established, can offset facts that might otherwise warrant a finding of qualified immunity. *See, e.g.*, *Carossia v. City of New York*, 39 A.D.3d 429, 430 (1st Dep't 2007). The Court accordingly does not consider this question at the pleading stage.

matter of law that the Municipal Defendants' decision to initiate removal proceedings, based in

significant part on evidence of a clavicle fracture impeached by the medical facts before them, was

supported by probable cause and in good faith.[14]

            *e.*     *Actual Malice*

Last, plaintiffs must allege that the defendants acted with "actual malice." *Stampf*, 761

F.3d at 198. That burden is easily satisfied because, at the pleadings stage, "lack of probable

cause generally raises an inference of malice." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123,

131 (2d Cir. 1997); *see Emanuel I*, 2013 WL 5477505, at *7. Accordingly, plaintiffs have pled

each element of their claim for malicious prosecution.[15]

---

[14] Other challenges plaintiffs make to probable cause fare less well. Most significant, they fault
the Municipal Defendants for bringing the removal action in the face of Dr. Grimm's assessment
that there had not been child abuse. But Dr. Grimm's assessment pre-dated reports of abuse to
ACS, including by Dr. Lupica and others, suggesting the parents concealed the true nature and
timing of A.K.'s injury. Am. Compl. ¶¶ 64, 79–81, 105. These later reports gave ACS sound
reason to reassess its (and Dr. Grimm's) conclusion. *See Id.* ¶¶ 61–67, 77 (noting that, before
such reports, ACS had concluded that "there was no reason to remove [A.K.] . . . as the
[Parents'] story was consistent with injuries as reported by Mt. Sinai"). And contrary to the
parents' claim, ACS's decision not to cite Dr. Grimm's opinion before the family court does not
mean that it "suppressed" exculpatory evidence. Plaintiffs do not cite authority that, at any stage
of removal proceedings, ACS had a duty to set out for the court all contrary opinions. On the
contrary, the Second Circuit has specifically rejected any duty of ACS caseworkers to present
exculpatory evidence in family-court proceedings. *See Cornejo v. Bell*, 592 F.3d 121, 129 (2d
Cir. 2010) (no constitutional violation where "the heart of the complaint . . . is that [ACS] failed
to adequately apprise the Family Court of exculpatory information"). Plaintiffs also overreach in
claiming that ACS was wrong to rely on Dr. Lupica's assessment, because it, as alleged, was
untrue. Unless the Municipal Defendants had a basis to appreciate that Dr. Lupica's account was
false, they could consider it in determining whether probable cause supported commencing
removal proceedings. *See Simpson v. Town of Warick Police Dep't*, 159 F. Supp. 3d 419, 436–37
(S.D.N.Y. 2016) (collecting cases); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 527
(S.D.N.Y. 2015) ("Even assuming the version of facts set forth by Plaintiff, that Rose felt
coerced and gave false information, this alone does not defeat probable cause to arrest.").

[15] The Municipal Defendants have not moved specifically as to any individual ACS employees,
instead arguing that plaintiffs' claims fail across the board. Thus, although it appears that
plaintiffs have pled this claim as to only some subset of those defendants, the Court will not *sua
sponte* dismiss this claim as to the others.

### 3.      Abuse of Process

Plaintiffs also allege abuse of process.  "In order to state a [§ 1983] claim for abuse of

process, a plaintiff must establish that the defendants had an improper purpose in instigating the

action . . . [and] that they aimed to achieve a collateral purpose beyond or in addition to his

criminal prosecution."  *Morales v. City of New York*, 752 F.3d 234, 238 (2d Cir. 2014) (quoting

*Savino*, 331 F.3d at 77).  Thus, plaintiffs must show that defendants: "(1) employ[ed] regularly

issued legal process to compel performance or forbearance of some act (2) with intent to do harm

without excuse of justification, and (3) in order to obtain a collateral objective that is outside the

legitimate ends of the process."  *Savino*, 331 F.3d at 76 (citation omitted).

As with malicious prosecution, the existence of probable cause is a complete defense to

an abuse-of-process claim.  *See Irish v. City of New York*, No. 09 Civ. 5568 (RMB), 2010 WL

5065896, at *6 (S.D.N.Y. Dec. 6, 2010) ("[T]he presence of probable cause negates a claim for

abuse of process." (quoting *Sforza v. City of New York*, No. 07 Civ. 6122 (DLC), 2009 WL

857496, at *17 (S.D.N.Y. Mar. 31, 2009))).  And the mere presence of an improper motive in

commencing or continuing legal proceedings is insufficient to state a claim for abuse of process;

instead, plaintiffs must allege that defendants used legal process to achieve a "collateral

objective" outside the aims of that process.  *See Savino*, 331 F.3d at 77.  Thus, "it is not

sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by

pursuing [a legal action].  Instead, he must claim that they aimed to achieve a collateral purpose

beyond or in addition to his criminal prosecution."  *Id.*; *see Brandon v. City of New York*, 705 F.

Supp. 2d 261, 275 (S.D.N.Y. 2010) (citing "extortion, blackmail, retribution, or similar

extraneous harmful goal" as examples of improper collateral purposes).

In moving to dismiss, the Municipal Defendants argue that they had probable cause to

commence the removal proceedings, that abuse-of-process claims cannot arise from civil

proceedings, and that plaintiffs have not alleged any collateral objective on their part outside the legitimate ends of the process. The first two arguments largely overlap with arguments the Court has found unavailing in the context of plaintiffs' malicious prosecution claims. But the last, the lack of a collateral objective, is unique to the abuse of process claim. And plaintiffs have not responded to that argument.[16] By failing to do so, plaintiffs have abandoned that claim. *Romeo & Juliette*, 2014 WL 4723299, at *7.

In any event, defendants are right that the Amended Complaint pleads insufficient facts as to a collateral objective on their part. The Amended Complaint alleges that all defendants commenced the family court proceeding "to insulate [defendants] from various levels of civil liability," to "deprive Plaintiffs of their fundamental constitutional protections," and to "financially harm them by draining a substantial part of their personal resources, in order to leverage and otherwise extract a plea/admission and shield themselves from liability." Am. Compl. ¶¶ 229–30. The first of the theories does not sensibly apply to the Municipal Defendants, who, far from deflecting civil liability, exposed themselves to such liability (viz, this lawsuit) by commencing proceedings. And none reach "beyond and in addition to" the removal proceedings themselves. *See, e.g.*, *Moritz v. Town of Warwick*, No. 15 Civ. 5424 (NSR), 2016 WL 3248494, at *5 (S.D.N.Y. June 9, 2016) ("Deprivation of liberty, embarrassment, inconvenience, and legal expenses are direct, rather than collateral, consequences of arrest that are insufficient to support a malicious abuse of process claim."). At best, plaintiffs insinuate improper motives on the part of these defendants (*e.g.*, retaliation for the parents' litigiousness). But "neither retaliation nor a malicious motive . . . is a sufficient collateral objective" to state a claim for abuse of process.

---

[16] The only references to abuse of process in plaintiffs' opposition are in two footnotes, in which plaintiffs state that this claim "implicate[s] rights that [are] clearly established under the Constitution" and that it is one of their state-law claims. Pl. Opp'n at 16 n.6, 43 n.15.

*Peter L. Hoffman, Lotte, LLC v. Town of Southampton*, 523 F. App'x 770, 771 (2d Cir. 2013) (summary order).  Accordingly, the Court dismisses plaintiffs' claim for abuse of process.

### 4.      Conspiracy Under §§ 1983 and § 1985

#### a.      *Section 1983*

To succeed on a § 1983 claim for conspiracy, a plaintiff must allege: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).  A "plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (citation omitted).  "Allegations of 'joint conduct' are not sufficient." *Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 520 (S.D.N.Y. 2015).  Further, a "plaintiff alleging a § 1983 conspiracy must allege a predicate violation of constitutional rights." *Norales v. Acevedo*, No. 20 Civ. 2044 (DLC), 2021 WL 739111, at *10 (S.D.N.Y. Feb. 24, 2021).  And "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978).

As discussed above, plaintiffs have failed to plausibly allege a conspiracy between any Medical Defendant and ACS.  *See supra* pp. 23–24.  Nor, beyond conclusory allegations, do plaintiffs plead a conspiracy within ACS, or with any other state actors.  The only alleged state participant in the supposed conspiracy was Lawson, who could not have conspired with herself.  And, as stated, even had Lawson agreed with other ACS employees, such could not support a § 1983 conspiracy.  *See Herrmann*, 576 F.2d at 459.  Accordingly, the Court dismisses plaintiffs' claims of a § 1983 conspiracy against all defendants.

b.      *Section 1985*

To prevail on a conspiracy claim under § 1985, Plaintiffs must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007).  It also requires a showing that the conspiracy was "motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus."  *Id.* (citation omitted).

For the reasons above, the Court agrees with the Municipal Defendants that plaintiffs have failed to plausibly allege a conspiracy at all.  That alone requires dismissal of this claim. *See, e.g.*, *id.* at 792.  Further, as the Municipal Defendants note, plaintiffs have also not alleged that any of the defendants' actions were motivated by a discriminatory animus.  Rather, they allege that defendants acted either out of a desire for self-preservation or retaliation.  Again, plaintiffs offer no counter to these points.  Accordingly, the Court dismisses plaintiffs' § 1985 claim, both because plaintiffs have abandoned it and because it is deficient on the merits.  *See Romeo & Juliette*, 2014 WL 4723299, at *7.

### 5.      Intentional Deprivation of Constitutional Rights

Plaintiffs broadly assert a separate cause of action for "intentional violation of federally protected constitutional rights" against all defendants, accusing all of attempting to interfere with their "rights to effectively and without unnecessary governmental intrusion, parent and otherwise associate with their children."  Am. Compl. ¶ 258.  Although the Medical Defendants moved to dismiss this claim, the Municipal Defendants appear to have overlooked it.  *See generally* City Mem. (seeking dismissal of entire Amended Complaint but failing to address Count Four); City Reply.  Without arguments directed to this claim, the Court will not dismiss it *sua sponte*, and, in

38

any event, this claim appears to track (seemingly completely) plaintiffs' claim—which the Court has allowed to proceed against the Municipal Defendants—of malicious prosecution. The Court accordingly does not yet have occasion or cause to dismiss this claim.

### 6.    **False Imprisonment**

Plaintiffs also assert false imprisonment under § 1983. To prevail on that claim, they must plead that: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016).

In the Amended Complaint, plaintiffs allege that the "restrictions upon [their] collective liberty to associate with one another constitutes '*confinement*' as a matter of New York State and Constitutional law." Am. Compl. ¶ 283. They do not cite any authority in support of this broad conception of "confinement," and do not otherwise allege any actual confinement, let alone that A.K. or any other plaintiff was aware of it. *See id.* ¶¶ 281–86. And after defendants each moved to dismiss because of these failures, plaintiffs again did not respond.[17] This claim is therefore also abandoned, and the Court dismisses it. *See Romeo & Juliette*, 2014 WL 4723299, at *7.

### 7.    *Monell* **Liability**

Finally, plaintiffs pursue liability on all the above counts against the City of New York under *Monell*, 436 U.S. 658. Municipal liability in a § 1983 action may not rest on *respondeat superior* or vicarious liability. *Id.* at 691. Instead, to hold a municipality liable under § 1983 for unconstitutional actions of its employees, a plaintiff must prove that there was a municipal policy or custom that directly subjected her to a constitutional violation. *See Amnesty Am. v. Town of*

---

[17] Plaintiffs mention this claim twice in their opposition, but only to state that it "implicate[s] rights that [are] clearly established under the Constitution," and that it is among their state-law claims. *See* Pl. Opp'n at 16 n.6, 43 n.15.

*West Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) ("[C]onstitutional torts committed by city employees without official sanction or authority do not typically implicate the municipality in the deprivation of constitutional rights, and therefore the employer-employee relationship is in itself insufficient to establish the necessary causation." (citation omitted)).

> A plaintiff can establish the existence of a policy or custom by showing:
>
> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted) (collecting cases).

Absent an underlying constitutional violation, the Court need not address municipal liability. *See, e.g.*, *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). Accordingly, at the threshold, *Monell* liability cannot obtain for plaintiffs' claims for abuse of process, conspiracy under §§ 1983 and 1985, or false imprisonment. Further, plaintiffs largely base their *Monell* claim on the City's alleged "widespread policy and custom of having doctors and social workers act under the color of law . . . and bring the coercive and overwhelming forces of governmental authority to bear on individuals and families without accountability." Am. Compl. ¶ 262. However, the Court has already held that, here, the medical doctors of whom plaintiffs complain are not state actors, and so cannot have been party to any constitutional violations. Plaintiffs' notion that a City policy relating to these professionals—whose reporting is, in fact, required by state law, *see* N.Y. Soc. Serv. Law § 413—could support liability on the part of the City thus fails at the threshold. *See Segal*, 459 F.3d at 219. In any event, plaintiffs do not

plausibly allege any such policy. Instead, they merely recite the facts of their own experience with ACS, and conclusorily declare it representative of a broader policy or custom. *See* Am. Compl. ¶¶ 266–71; *e.g.*, *Aragon v. New York*, No. 14 Civ. 9797 (ER), 2017 WL 2703562, at *6 (S.D.N.Y. June 22, 2017) (dismissing *Monell* claim where plaintiffs "allege[d] the existence of a practice adopted by the City solely based on Plaintiff's alleged experience").

As to plaintiffs' surviving § 1983 claims, the Amended Complaint alleges only the third basis for *Monell* liability: a consistent and widespread practice, custom, or usage of the City.[18] Where this theory is adequately pled, "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bd. of Cnty. Comm'rs of Bryant Cnty. v. Brown*, 520 U.S. 397, 404 (1997).

> Here, plaintiffs allege that it is a "custom and practice" of the City to
>
> initiate[] a removal proceeding on less than probable cause knowing and relying on the fact that for an overwhelming percentage of parents the financial and emotional wherewithal to stand their ground to the bitter end is not possible and that they accept a negotiated plea which, in turn, insulates ACS from liability.

Am. Compl. ¶ 278. Plaintiffs provide one factual datum in support: Iwenofu's statement that, in her 16 years working for ACS, she had never seen a case discharged without "someone taking the blame." *Id.* ¶¶ 129, 279. But that stray observation does not speak to any broader policy

---

[18] Plaintiffs' opposition brief also suggests the City may be liable based on a "failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference." Pl. Opp'n at 41 (quoting *Brandon*, 705 F. Supp. 2d at 276–77). But the Amended Complaint does not allege facts supporting this theory of municipal liability. *See* Am. Compl. ¶¶ 261–80; *Cruz v. City of New York*, No. 15 Civ. 2265 (PAE), 2016 WL 234853, at *6 (S.D.N.Y. Jan. 19, 2016) (holding that plaintiffs "cannot add [new theories of *Monell* liability] in an opposition brief" and collecting cases). Similarly, plaintiffs cite cases discussing instances in which "a municipality may be liable for a single incident under proper circumstances," Pl. Opp'n at 40–41 (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 480 (1986)), but do not explain why such circumstances are present here, let alone identify allegations that support that theory. These theories, too, cannot survive.

of maliciously prosecuting individuals.  It says nothing about whether the actions she described were commenced with or without probable cause or malice.  And if all those actions, in fact, concluded in a compromise, as Iwenofu's statement implies, none would have terminated in favor of the accused.  *See, e.g.*, *Rothstein*, 373 F.3d at 286.

Otherwise, plaintiffs do not cite any facts in support of the existence of this alleged policy.  Nor do they allege any prior legal actions involving the same or similar issues, or even any specific family-court proceedings, even if they did not lead to a § 1983 action, that fit the pattern alleged here.  *See, e.g.*, *Cruz*, 2016 WL 234853, at *5 (allegations of eight previously settled civil rights actions "fall far short of establishing a custom sufficient to support a *Monell* claim"); *Calderon v. City of New York*, 138 F. Supp. 3d 593, 613 (S.D.N.Y. 2015) (dismissing *Monell* claims where plaintiff "does not cite *any* civil cases that implicated the unlawful practice she challenges"); *Tieman v. City of Newburgh*, No. 13 Civ. 4178 (KMK), 2015 WL 1379652, at *17 (S.D.N.Y. Mar. 26, 2015) (same where plaintiff cited 13 prior cases involving similar allegations, but none had "result[ed] in an adjudication of liability").  Devoid of any concrete factual allegations from which the existence of an unconstitutional municipal policy, custom, or usage that caused plaintiffs' injuries could be inferred, the Amended Complaint fails to state a claim for municipal liability under § 1983.  The Court thus dismisses plaintiffs' *Monell* claim against the City.[19]

---

[19] Plaintiffs also name Hansell, ACS's Commissioner, as a defendant, but only in his official capacity and insofar as he is "the government official whose edicts and acts represent the official policy, practices, customs and regulations of ACS."  *See* Am. Compl. ¶ 12.  They do not allege his personal involvement in any unconstitutional acts.  His dismissal may well be warranted under the same principles discussed above.  *See, e.g.*, *D'Alessandro v. City of New York*, 713 F. App'x 1, 10 (2d Cir. 2017).  Defendants, however, have not moved to dismiss him from this action based on his lack of personal involvement, and the Court will not do so *sua sponte*.

* * *

Accordingly, the Court will dismiss all federal claims against the Medical Defendants, because plaintiffs have not plausibly alleged that they were state actors or conspired with state actors in any relevant way.  The Court also dismisses plaintiffs' claims against the Municipal Defendants under § 1983 for abuse of process, false imprisonment, and conspiracy, and under § 1985 for conspiracy.  However, the Court denies the Municipal Defendants' motion to dismiss plaintiffs' § 1983 claim for malicious prosecution and a violation of their substantive due process rights.  As to the City of New York, however, the Court dismisses those latter claims, as well.

### C. State Claims

#### 1. Supplemental Jurisdiction

Federal district courts have discretion to exercise supplemental jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).  Federal and state law claims are part of the same case or controversy if they share "a common nucleus of operative fact."  *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 165 (1997).  Claims share such a nucleus if "the facts underlying the federal and state claims substantially overlap or the federal claim necessarily brings the facts underlying the state claim before the court."  *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 335 (2d Cir. 2006) (cleaned up).  Here, plaintiffs bring many state-law claims, some of which overlap nearly entirely with their federal claims, and others of which arise from a common nucleus of operative facts.  Accordingly, with one exception discussed below, the Court exercises its supplemental jurisdiction over plaintiffs' state-law claims.

### 2. Malicious Prosecution

As to the Municipal Defendants, the elements of malicious prosecution under New York law are largely the same as under § 1983, save for the requirement of a constitutional violation. *See Stampf*, 761 F.3d at 198; *see also Lanning*, 908 F.3d at 24–25 (noting that New York law requires a lesser "favorable termination" showing than § 1983 does, as New York law requires only that the termination of the action is "not inconsistent with the Plaintiff's innocence" (citation omitted)). The Court thus denies the Municipal Defendants' motion to dismiss plaintiffs' state-law claim for malicious prosecution for the reasons given above.

Plaintiffs have also named the City of New York in this count. Although § 1983 claims may not be asserted based on a theory of *respondeat superior*, New York law does provide for vicarious liability in some circumstances. *See, e.g.*, *Velez v. City of New York*, 730 F.3d 128, 136–37 (2d Cir. 2013); *Biswas v. City of New York*, 973 F. Supp. 2d 504, 539–40 (S.D.N.Y. 2013); *Swierczynski v. O'Neill*, 41 A.D.3d 1145, 1146 (4th Dep't 2007). The Municipal Defendants have not addressed this point. The Court accordingly leaves standing the state-law claim for malicious prosecution against the City.

As to the Medical Defendants, the question is more complex. To state a claim for malicious prosecution under New York law, a plaintiff must allege "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Stampf*, 761 F.3d at 198. As under § 1983, such claims, under New York law, can arise out of civil proceedings. *See, e.g.*, *Perryman v. Village of Saranac Lake*, 41 A.D.3d 1080, 1081 (3d Dep't 2007). Unlike under § 1983, however, New York law authorizes claims for malicious prosecution against private individuals, even if not state actors, where they "played an active role in the prosecution, such as giving advice and

encouragement or importuning the authorities to act." *Rohman*, 215 F.3d at 217 (quoting *DeFilippo v. County of Nassau*, 183 A.D.2d 695, 696 (2d Dep't 1992)).

The Medical Defendants argue, *inter alia*, that plaintiffs' state-law claim for malicious prosecution against them fails because ACS, not they, initiated the removal proceeding. As to most such defendants, the Court agrees. Under New York law, "[t]he mere reporting of a crime to police and giving testimony are insufficient" to establish liability for malicious prosecution. *Estiverne v. Esernio-Jenssen* ("*Estiverne I*"), 581 F. Supp. 2d 335, 348 (E.D.N.Y. 2008) (quoting *Present v. Avon Prods., Inc.*, 253 A.D.2d 183, 189 (1st Dep't 1999)). That applies even if a defendant gave "false information to the authorities." *Id.* (quoting *Lupski v. County of Nassau*, 32 A.D.3d 997, 998 (2d Dep't 2006)). A private individual who falsely reports to the authorities can be held responsible for initiating a prosecution only upon a "showing that, at the time the information was provided, the defendant knew it to be false." *Id.*

Largely for the reasons given above in explaining why such private reporters are not state actors, the Court holds that plaintiffs have not plausibly alleged that Dr. Ranade, Dr. Fabricant, Dr. Platt, Dr. Shaykh, or Glass played an active role in the removal proceedings, either by encouraging or advising ACS to act. Rather, setting aside the Amended Complaint's speculative and conclusory allegations, plaintiffs allege only that these defendants reported suspected child abuse to ACS, as they were required to do by N.Y. Soc. Serv. Law § 413. Dr. Ranade had examined A.K. and observed both a femur fracture and potentially injured clavicle, and reported such observations to ACS—tempering her assessment by noting that she could not confirm a clavicle fracture. *See* Am. Compl. ¶ 105. Dr. Fabricant and Glass may have repeated Dr. Lupica's story to ACS but, even assuming that story was false, plaintiffs have not plausibly alleged that these defendants knew it to be so at the time. And Dr. Platt and Dr. Shaykh are not

alleged to have ever contacted ACS.  Accordingly, plaintiffs have not plausibly alleged that any of these defendants initiated the removal proceedings.  The Court grants their motions to dismiss the state-law claims for malicious prosecution against them.[20]

As to Dr. Lupica, however, the analysis differs.  The Amended Complaint plausibly alleges that her reports, both to the other private individuals on the August 27–30, 2018 email chain and to an ACS caseworker, were *deliberately* false.  *See supra* pp. 20–21.  It alleges that, once confronted with her failure to diagnose A.K.'s broken femur, she declared that there was "no way" that A.K. had that injury at the time of her initial examination.  *See* Am. Compl. ¶¶ 74–75.  And it alleges that Dr. Lupica, apparently to enhance the credibility of her false statement, further falsely claimed to have examined—or at least been in the presence of—A.K. for four hours, rather than the five minutes that she actually spent with A.K.  The Amended Complaint further alleges that Dr. Lupica, in an error that exposed her unfamiliarity with A.K., misidentified A.K. as male.  *Id.*  Such allegations are enough to push plaintiffs' claim of Dr. Lupica's deliberate lying from merely conceivable to plausible.  *See Iqbal*, 556 U.S. at 678.[21]

---

[20] Although the above reasoning independently requires dismissal, these defendants are also protected by N.Y. Soc. Serv. Law § 419, which confers immunity against state-law liability for the mandatory reporting of suspected child abuse or neglect, absent "willful misconduct or gross negligence." *Isabelle V. v. City of New York*, 150 A.D.2d 312, 313 (1st Dep't 1989).  Thus, "[m]andated reporters need not await conclusive evidence of abuse or maltreatment but must act on their reasonable suspicions[,] and the law allows them a degree of latitude to err on the side of protecting children who may be suffering from abuse." *Id.*  Because plaintiffs have not plausibly alleged willful misconduct or gross negligence by these doctors, and have pled that A.K. presented with severe injuries, these defendants, even taking plaintiffs' non-conclusory allegations as true, acted reasonably in the situation, triggering immunity under section 419.

[21] In their reply, the Weill Cornell defendants argue that Dr. Lupica was correct in late-August 2018, and that A.K. did not, in fact, have the alleged femur fracture when she appeared at Weill Cornell on August 8, 2018.  *See* Weill Cornell Reply at 8–9.  That is of course possible.  And the discovery that will now commence will, of necessity, give the surviving defendants a fulsome opportunity to test whether Dr. Lupica's or the parents' version of events on August 8–9, 2018,

46

Accepting that allegation as true, plaintiffs have plausibly asserted a claim under New York law for malicious prosecution against Dr. Lupica. A private defendant can "initiate" a prosecution by giving false information to the authorities if "at the time the information was provided, the defendant knew it to be false." *Lupski*, 32 A.D.3d at 998; *see Emanuel I*, 2013 WL 5477505, at *7; *Estiverne I*, 581 F. Supp. 2d at 347–49. Here, the Amended Complaint so alleges as to Dr. Lupica. It alleges that, on the day that ACS commenced removal proceedings against plaintiffs, Dr. Lupica contacted ACS to falsely report child abuse, knowing her report was false. *See* Am. Compl. ¶¶ 75, 81. Those facts plausibly assign her an "active role" in the initiation of the removal proceedings. *Rohman*, 215 F.3d at 217. The Amended Complaint also pleads the other elements of this tort as to Dr. Lupica. The removal proceedings terminated in the parents' favor. *See supra* pp. 28–29. And assuming that the content of Dr. Lupica's report to ACS was false, plaintiffs have pled a lack of probable cause to so report. *See, e.g.*, *Emanuel I*, 2013 WL 5477505, at *7. Last, because the "lack of probable cause generally raises an inference of malice," *Ricciuti*, 124 F.3d at 131, plaintiffs have also plausibly alleged malice.[22]

Accordingly, the Court denies Dr. Lupica's motion to dismiss this claim. Because New York law, unlike § 1983, recognizes vicarious liability for employers in some circumstances, *see Velez*, 730 F.3d at 136–37, and the Weill Cornell Defendants have not offered any counter on this point, the Court also denies the motion to dismiss the claim against Weill Cornell. As to all other Medical Defendants, this claim is dismissed.

---

is true, and whether Dr. Lupica had a good-faith basis to make the claims that she did. But at this stage of the litigation, where the Court's review is limited to the pleadings, the Court must credit the well-pled allegations in the Amended Complaint.

[22] Dr. Lupica argues that she is immune under N.Y. Soc. Serv. Law § 419. *See* Weill Cornell Mem. at 13–14. But section 419 does not apply to instances of "willful misconduct" or "gross negligence," as is plausibly alleged here. *Isabelle V.*, 150 A.D.2d at 313.

### 3.    Abuse of Process

Plaintiffs' claim for abuse of process under New York law is governed by the same standards as their claim under § 1983.  *See Savino*, 331 F.3d at 76.  For the same reasons given above in connection with the § 1983 abuse-of-process claim—that plaintiffs have abandoned this claim and also failed to plausibly allege a collateral objective by any defendant—the Court dismisses this claim.  As to the latter point, insofar as plaintiffs allege false reporting by Medical Defendants such as Dr. Lupica, "courts have dismissed abuse of process claims for [lack of an ulterior motive] where" individuals "allegedly filed false allegations of abuse and harassment to obtain a protective order" against an individual, where the "ulterior and illegitimate" purpose identified was to harass a family member.  *Silver v. Kuehbeck*, 217 F. App'x 18, 21 (2d Cir. 2007) (summary order).  Even there, "the falsity of the allegations and defendant's malicious motive in making them do not, of themselves, give rise to a cause of action for abuse of process."  *Id.* (quoting *Butler v. Ratner*, 210 A.D.2d 691, 692 (3d Dep't 1994)).  Plaintiffs thus have not plausibly alleged abuse of process against any defendants under state law.

### 4.    False Imprisonment

Plaintiffs' claim for false imprisonment under state law similarly tracks their § 1983 claim for false imprisonment.  *See* Am. Compl. ¶¶ 281–86.  For the reasons above, the Amended Complaint does not state a claim for false imprisonment based on the removal of A.K. and M.K. from the parents' custody; and plaintiffs, in any event, have abandoned this claim.  The Court dismisses the state-law claim for false imprisonment.

### 5.    Intentional Infliction of Emotional Distress

"Under New York law, a claim for intentional infliction of emotional distress must satisfy an 'exceedingly high legal standard.'"  *DiRuzza v. Lanza*, 685 F. App'x 34, 36 (2d Cir. 2017) (summary order) (quoting *Chanko v. Am. Broad. Cos. Inc.*, 27 N.Y.3d 46, 57 (2016)).  First, the

tort "may be invoked only as a last resort, to provide relief in those circumstances where traditional theories of recovery do not." *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (citation omitted). Second, a party alleging IIED must plead conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Chanko*, 27 N.Y.3d at 56 (citation omitted). The time to bring a claim for IIED, as with most other intentional torts, is one year from the alleged actions giving rise to the claim. *See, e.g.*, *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 491 (2007) (citing N.Y. C.P.L.R. § 215).

Here, plaintiffs argue that the Medical Defendants' false reporting, and ACS's malicious prosecution of the removal proceeding, constitutes IIED. The Medical Defendants all argue that plaintiffs' IIED claim is time-barred because plaintiffs filed this action more than one year after the last of their alleged actions or communications with ACS took place. They are correct. Plaintiffs filed this action on May 1, 2020. *See* Dkt. 1. A timely claim for IIED thus must arise from actions on or after May 1, 2019. But the last alleged action by any Medical Defendant was Dr. Ranade's October 4, 2018 unauthorized x-rays of A.K. Am. Compl. ¶ 125; *see also id.* ¶ 29 (describing September 10, 2018 report to ACS that parents brought A.K. to see Dr. Ranade unaccompanied). And the last alleged acts by Dr. Lupica, Dr. Fabricant, Dr. Platt, Dr. Shaykh, and Glass occurred earlier, in August 2018. *See, e.g.*, *id.* ¶¶ 72–83. New York courts have specifically held that, for IIED claims based on false reporting to ACS, such claims accrue on the date of the false report, even where the resulting removal of a child takes place later on. *See, e.g.*, *Williams v. Georgopoulos*, 184 A.D.3d 608, 609 (2d Dep't 2020) (collecting cases). Accordingly, no acts on which the IIED claim against the Medical Defendants is based took

place within the one-year statute of limitations set by N.Y. C.P.L.R. § 215.  That forecloses plaintiffs' IIED claim against the Medical Defendants.[23]

As to the Municipal Defendants, their actions arguably continued into May 2019, when they ultimately withdrew the removal Petition.  Perhaps for this reason, they do not move on the basis of the statute of limitations.  But dismissal of this claim against the Municipal Defendants is required for an independent reason.  As defendants rightly argue, a "cause of action alleging intentional infliction of emotional distress should [be] dismissed as duplicative of [a] cause[] of action alleging malicious prosecution." *Leonard v. Reinhardt*, 20 A.D.3d 510, 510 (2d Dep't 2005) (collecting cases).  Because IIED "may be invoked only as a last resort," where alleged conduct "falls well within the ambit of other traditional tort liability," IIED claims generally are to be dismissed.  *Salmon*, 802 F.3d at 256; *see id.* at 257 ("[B]ecause other tort remedies were available to Salmon, the district court correctly dismissed his intentional infliction claim."); *see also Shaheed v. City of New York*, 287 F. Supp. 3d 438, 455 (S.D.N.Y. 2018) (citing malicious prosecution as one such tort, and dismissing IIED claim because injuries were not "irremediable through traditional tort remedies"), *aff'd sub nom. Shaheed v. Kroski*, 833 F. App'x 868 (2d Cir. 2020); *Leonard*, 20 A.D.3d at 510 (same).  Here, as the Court has held, ACS's decision to pursue removal proceedings, to the extent it may be found outrageous or intolerable, is redressable within the framework of the familiar tort of malicious prosecution.  Indeed, the facts that the Amended Complaint relies on in claiming IIED almost entirely repeat those offered in support of their malicious prosecution claim.  *See* Pl. Opp'n at 46 ("ACS, therefore, acting in concert with

---

[23] Plaintiffs argue, summarily in a footnote, that the Medical Defendants' conspiracy with ACS makes their claim timely.  *See* Pl. Opp'n at 46 n.16.  They do not cite authority for that notion.  And, as held above, the Amended Complaint does not plausibly allege any such conspiracy.

the members of the Weil Cornell/Ranade/HSS Conspiracy both ignored significant exculpatory evidence and manufactured a false or reckless diagnosis." (footnote omitted)).  *Compare* Am. Compl. ¶¶ 191–226 (malicious prosecution), *with id.* ¶¶ 322–30 (IIED).  Accordingly, the Court dismisses plaintiffs' IIED claim against the Municipal Defendants, as duplicative of their malicious prosecution claim against those defendants.

### 6.    Loss of Consortium and Companionship

All defendants have moved to dismiss plaintiffs' claims for loss of consortium and loss of companionship, on several grounds.  Plaintiffs have not responded.  This claim is abandoned, and the Court dismisses it.  *See Romeo & Juliette*, 2014 WL 4723299, at *7.

### 7.    Medical Malpractice

Plaintiffs bring two claims for medical malpractice: (1) against Dr. Lupica, Dr. Shaykh, and Weill Cornell for allegedly failing to diagnose A.K.'s broken femur on August 8, 2018; and (2) against Dr. Ranade, for allegedly taking unauthorized x-rays of A.K., without informed consent, on October 4, 2018.  *See* Am. Compl. ¶¶ 287–315.  Those defendants each move to dismiss those claims against them.

The Court denies the Weill Cornell Defendants' motion.  They first argue that, because A.K. promptly received proper treatment for her fracture at Mt. Sinai, "any claim for purported malpractice is limited to treatment over the course of less than 24 hours."  Weill Cornell Mem. at 22.  Although that fact bears on the damages available to plaintiffs, it does not defeat the claim that defendants "deviat[ed] from accepted medical standards" in examining A.K. at the outset of her care.  *E.g.*, *Gold v. Hershey*, 90 A.D.2d 704, 705 (1st Dep't 1982).  Second, they argue that the Court should exercise its discretion to decline supplemental jurisdiction over this claim.  But Weill Cornell's August 8, 2018 examination of A.K. is interwoven with other issues in this case— including whether Dr. Lupica truthfully reported her assessment that night.  And other claims

implicating these events, against both Dr. Lupica and others, are proceeding to discovery.  Absent

"exceptional circumstances" or "other compelling reasons for declining jurisdiction," the Court

will not decline supplemental jurisdiction over this claim.  28 U.S.C. § 1367(c)(4).

As to the claim against Dr. Ranade, however, the Court declines to exercise such

jurisdiction.  *See* Mt. Sinai Mem. at 19.  The Court has dismissed all other claims against Dr.

Ranade.  And Dr. Ranade's October 4, 2018 x-rays, which she took months after the removal

proceedings commenced and never allegedly relayed to ACS or anyone else, are unrelated to any

of plaintiffs' surviving claims against any remaining defendants.  The Court dismisses this claim,

without prejudice to plaintiffs' right to pursue it in state court.

### 8.    Defamation

Last, plaintiffs bring a claim for defamation, solely against Dr. Ranade, Dr. Platt, and

Glass.  In support, they cite (1) Dr. Platt's emailed statements, on August 27–30, 2018, that the

parents were "dangerous" and that she could not "imagine how ACS released this vulnerable

infant to the family," Am. Compl. ¶¶ 376–78; (2) Dr. Ranade's reports to ACS of suspected child

abuse or neglect, *id.* ¶¶ 379–81; and that Glass "reiterated and repeated" the claim that the

parents were "dangerous," *id.* ¶ 382.

Defendants argue that these claims are time-barred.  Plaintiffs have not responded.  The

Court holds with defendants.  Under New York law, an action for defamation or slander must

"be commenced within one year of the publication or utterance of the defamatory statement,"

and "[d]iscovery does not extend the one-year period." *Frederick v. Fried*, 10 A.D.3d 444, 445

(2d Dep't 2004) (collecting cases).  Plaintiffs filed this action on May 1, 2020, meaning that only

statements on or after May 1, 2019 may be actionable.  *See id.*  All of Glass's, Dr. Platt's, and

Dr. Ranade's allegedly defamatory statements occurred between August and October 2018.

Accordingly, plaintiffs' claim for defamation is dismissed as untimely.

**CONCLUSION**

For the foregoing reasons, the Court rules as follows on the motions to dismiss.

The Court grants in full the motions to dismiss by the HSS Defendants and the Mt. Sinai Defendants.

The Court grants in part and denies in part the motion by the Municipal Defendants. The Court dismisses all claims against the Division of Child Protection, ACS, and the New York Comptroller, and all federal claims against the City of New York. The Court also dismisses plaintiffs' claims for abuse of process under federal and state law, false imprisonment under federal and state law, conspiracy under §§ 1983 and 1985, loss of companionship and consortium under state law, and IIED under state law, against all Municipal Defendants. However, the Court denies the Municipal Defendants' motion as to plaintiffs' claims (1) for malicious prosecution, under federal and state law, as alleged against the individual Municipal Defendants; (2) for violation of plaintiffs' right to family integrity under 42 U.S.C. § 1983, as alleged against the individual Municipal Defendants; and (3) for malicious prosecution, only under state law, as alleged against the City of New York.

Finally, the Court grants in part and denies in part the motion by the Weill Cornell Defendants. The Court dismisses all federal claims against those defendants, as well as the state-law claims against them for false imprisonment, abuse of process, loss of consortium and companionship, IIED, and defamation. The Court also dismisses all other claims against Dr. Platt, and the state-law malicious prosecution claim against Dr. Shaykh. The Court, however, denies the motion to dismiss plaintiffs' claims (1) against Dr. Lupica and Weill Cornell for malicious prosecution under state law; and (2) against Dr. Lupica, Dr. Shaykh, and Weill Cornell for failure to diagnose.

Accordingly, this case will proceed solely as to the following claims: (1) malicious prosecution under § 1983 against the individual Municipal Defendants; (2) violation of the family's substantive due process rights under § 1983 against the individual Municipal Defendants; (3) malicious prosecution under state law against the individual Municipal Defendants, the City of New York, Dr. Lupica, and Weill Cornell; and (4) failure to diagnose against Dr. Lupica, Dr. Shaykh, and Weill Cornell.

The Clerk of Court is respectfully directed to terminate as parties to this case defendants Dr. Sheena Ranade, Mt. Sinai Hospital, Dr. Peter Fabricant, LSW Karen Glass, the Division of Child Protection, the New York Comptroller, and the Administration for Children's Services. The Clerk of Court is further directed to terminate the motions pending at dockets 89, 93, 99, and 112.

An order scheduling an initial conference in this case will issue shortly.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: March 24, 2021
      New York, New York