UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SHVETA KAKAR KURTZ, DANIEL L. KURTZ,
A.K., *a minor child*, and M.K., *a minor child*,

                                        Plaintiffs,

                -v-

DAVID HANSELL, *as the Duly Appointed
Commissioner of the New York City Administration
for Children's Services*, CITY OF NEW YORK,
YSCARY RODRIGUEZ, *individually and as a
caseworker employed by ACS*, BRENDA LAWSON,
*individually and as an ACS case manager/supervisor*, DR.
MARIE LUPICA, *as treating physician and state actor
operating under color of law*, UNNAMED ACS
WORKERS AND EMPLOYEES 1–10, UNNAMED
EMPLOYEES AND WORKERS OF NEW YORK
PRESBYTERIAN HOSPITAL/WEILL CORNELL
MEDICAL CENTER 1–10, UNNAMED WORKERS
AND EMPLOYEES OF MT. SINAI HOSPITAL 1–10,
NEW YORK PRESBYTERIAN HOSPITAL/WEILL-
CORNELL MEDICAL CENTER,

                                        Defendants.

---

20 Civ. 3401 (PAE)

OPINION &
ORDER

---

PAUL A. ENGELMAYER, District Judge:

This case arises from—and challenges conduct by doctors and government officials in

connection with—child-removal proceedings carried out by the New York City Administration

for Children's Services ("ACS").  Plaintiffs Shveta Kakar Kurtz ("Kakar") and Daniel L. Kurtz

("Kurtz") (together, the "parents" or "plaintiffs") are the parents of twin, infant girls, A.K. and

M.K., who were born premature.  On August 8, 2018, the parents took A.K., age approximately

2 months, to the Emergency Department ("ED") of New York Presbyterian Hospital/Weill

Cornell Medical Center ("Weill Cornell"), where the parents reported that while changing A.K.'s

diaper, Kurtz had dropped her onto the kitchen floor.  The Weill Cornell ED diagnosis did not

include a femur break.  However, during a visit approximately 5.5 hours later to a second

hospital, Mount Sinai ("Sinai"), different ED doctors there diagnosed such a break.

During the ensuing weeks, after follow-up visits at multiple hospitals, several medical

professionals reported to ACS suspected abuse or neglect of A.K.  ACS then launched removal

proceedings in New York City Family Court (the "Family Court").  During the ensuing nine

months of litigation, the parents were either separated from M.K. and A.K. or had restrictions

placed on their contact with the children.  Ultimately, after the family moved for summary

judgment in Family Court, ACS withdrew its removal petition, and the Family Court dismissed

the action with prejudice.

On May 1, 2020, the parents, who are attorneys, initiated this action.  They alleged that

that the removal proceedings had resulted from a broad and unlawful conspiracy between the

medical staff who initially failed to diagnose A.K.'s broken femur, a large number of other

doctors and medical institutions, and ACS.

The parents alleged that the goal of the conspiracy was to cover up the first hospital's

failure to diagnose A.K.'s femur fracture and to retaliate against the family for its litigiousness.

*See* Dkt. 1 ("Complaint"); Dkt. 55 ("Amended Complaint").  The parents sued the City of New

York (the "City"), ACS, two hospitals, and many employees of each institution.  The parents'

federal claims, under 42 U.S.C. §§ 1983 and 1985, principally alleged malicious prosecution,

abuse of process, conspiracy, false imprisonment, and violation of their constitutional rights to

family integrity and freedom of association.  Their state-law claims principally alleged

intentional infliction of emotional distress, medical malpractice, loss of consortium and

companionship, and defamation.

In May 2021, this Court resolved defendants' four motions to dismiss. *See Kurtz v. Hansell*, No. 20 Civ. 3401 (PAE), 2021 WL 1143619 (S.D.N.Y. Mar. 24, 2021). The Court's rulings pruned the case of various claims and defendants. The four claims the Court left standing were further narrowed during and after discovery. At present, three claims remain: (1) under § 1983, a malicious prosecution claim against ACS employees Rodriguez and Lawson (the "ACS Defendants"); (2) under state law, a malicious prosecution claim against the ACS Defendants and the City, and Dr. Lupica and Weill Cornell (the "Medical Defendants"); and (3) under state law, medical malpractice, for failure to diagnose A.K.'s femur fracture, against the Medical Defendants.

Pending now are motions by all defendants for summary judgment as to all claims. The parents opposed these motions. For the following reasons, the Court (1) grants in full the ACS Defendants and City's motion for summary judgment; and (2) grants the Medical Defendants' motion for summary judgment on the malicious prosecution claim but denies their motion for summary judgment on the medical malpractice claim. This case will now proceed to trial on that sole surviving claim.

# I.    Background

## A.    Factual Background[1]

### 1.    Parties

#### a.    Plaintiffs

Kakar and Kurtz are the parents of A.K. and M.K.  Dkt. 207 ("JSF") ¶ 1.  A.K. and M.K. are fraternal twins born nearly two months premature, on June 4, 2018.  *Id.* ¶ 2.  After birth, the twins spent approximately seven and one-half weeks at Sinai's Neonatal Intensive Care Unit ("NICU").  *Id.* ¶ 3.

#### b.    City Defendants and Non-Parties

ACS's Division of Child Protection conducts investigations of suspected child abuse and neglect.  *Id.* ¶ 7.  Defendant David Hansell was ACS's commissioner from February 2017 to December 2021.  *Id.* ¶ 6.  ACS employed defendant Yscary Rodriguez ("Rodriguez") as a child

---

[1] The Court draws its account of the underlying facts of this case from the parties' submissions in support of and in opposition to the defendants' summary judgment motions.  These include: (1) in support of the ACS Defendants and City's motion for summary judgment, a memorandum of law, Dkt. 224 ("ACS and City Mem."), a Local Rule 56.1 statement, *see* Dkts. 223, 227, and supporting declarations, *see* Dkts. 220–22; (2) in support of the Medical Defendants' motion for summary judgment, a memorandum of law, Dkt. 214 ("Medical Def. Mem."), a Local Rule 56.1 statement, *see* Dkt. 216, and supporting exhibits and declarations, *see* Dkts. 215, 217–18; and (3) in opposition to these motions, plaintiffs' memoranda of law, Dkts. 225 ("Pl. ACS and City Opp."), 228 ("Pl. Medical Opp."), and supporting declarations, Dkts. 226, 229; and (4) in further support, defendants' reply memoranda, Dkts. 233, 237.

Citations to a party's Rule 56.1 statement incorporate by reference the materials cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

protective specialist and assigned her to the Kurtz matter. *Id.* ¶¶ 8–9. Rodriguez was supervised by defendant Brenda Lawson ("Lawson"), who was ACS's director of field operations. *See id.* ¶¶ 10–14.

c.    *Medical Defendants and Non-Parties*

*Weill Cornell*: Defendant Marie Lupica, M.D. ("Dr. Lupica") was an emergency medicine attending physician board-certified in pediatric emergency medicine. *Id.* ¶¶ 15–16. Former defendant Ramzi Shaykh, M.D. ("Dr. Shaykh") was a pediatric resident. *Id.* ¶ 17. Sharri Platt, M.D. ("Dr. Platt") was the chief of pediatric emergency medicine in the department of pediatrics. *Id.* ¶ 18.

*Hospital for Special Surgery ("HSS")*: Peter Fabricant, M.D. ("Dr. Fabricant") was a board-certified pediatric orthopedic surgeon who treated A.K. *Id.* ¶¶ 19–20. Karen Glass ("Glass") was a clinical social worker. *Id.* ¶ 21.

*Sinai*: Sheena Ranade, M.D. ("Dr. Ranade") was a pediatric orthopedic surgeon. *Id.* ¶ 22. Laura Hodo, M.D. ("Dr. Hodo") was one of A.K.'s admitting and attending physicians. *Id.* ¶ 23. Katherine Grimm, M.D. ("Dr. Grimm") was a child abuse pediatric consultant. *Id.* ¶ 24. Laura Popper, M.D. ("Dr. Popper") was A.K's pediatrician. *Id.* ¶ 25.

**2.    A.K. Visits the Weill Cornell ED on August 8, 2018**

On August 8, 2018, at approximately 7:30 p.m., the parents brought A.K. to the Weill Cornell ED. *Id.* ¶ 27. The parents told the medical staff that Kurtz was carrying the baby when he threw a diaper in the trash can, and A.K. slipped out of his hands, landing on her abdomen and face on the tile floor. *Id.* ¶ 37; *see also id.* ¶ 28 (Weill Cornell medical record stating, "fall from parents['] arms, head first"). The parents reported that A.K. had immediately cried after she was dropped, *id.* ¶ 38, but that thereafter she was fussy, yet consolable, *id.* ¶ 39. The parents

5

did not report to anyone at Weill Cornell any concerns relative to A.K.'s lower extremities—that is, either leg or femur. *Id.* ¶ 55.

Within minutes of presenting to the Weill Cornell ED, medical staff triaged A.K. and took her vital signs. *Id.* ¶ 29. She then underwent a telehealth screening conducted by an attending physician. *Id.* ¶ 30. Physicians and attendants took a history from the parents and produced contemporaneous notes during this time. *Id.* ¶¶ 31–33.

Dr. Shaykh, a pediatric resident, then examined A.K. *Id.* ¶ 34. This included a physical examination, the scope of which is in dispute. *Id.* He recorded his findings in the medical chart, *id.* ¶ 35, where he documented that there was a concern for a possible head injury, *id.* ¶ 36. He recommended a computerized tomography scan ("CT scan") of A.K.'s head to rule out intracranial hemorrhage. *Id.* ¶ 40.

Dr. Lupica next examined A.K. *Id.* ¶ 42. She took a history from the parents, *id.* ¶ 41, and performed an examination of A.K. This included a physical examination, the scope of which is in dispute. *Id.* ¶ 42. She did not observe any cuts, bruising, lacerations, burn marks, scarring, abrasions, hematomas, or ecchymoses on A.K.'s body, *id.* ¶¶ 43–49; she noted normal pulses throughout A.K.'s extremities, *id.* ¶ 50. At approximately 8:03 p.m., she ordered a CT scan of A.K.'s head, *id.* ¶ 51; at approximately 9:25 p.m., A.K. returned from the CT scan, *id.* ¶ 52. The CT scan was negative and did not find evidence of intracranial hemorrhage. *Id.* ¶ 53.

Until approximately 11:30 p.m., A.K. remained in the ED for observation. *Id.* ¶ 54. The ED diagnosis was "fall, head trauma." *Id.* ¶ 58. Two additional sets of vital signs were taken before discharge. *Id.* ¶ 56. Discharge directives included to follow-up with A.K.'s primary care physician. *Id.* ¶ 59. Kurtz signed the discharge form. *Id.* ¶ 57. A.K. was discharged at approximately 11:30 p.m. *Id.* ¶ 60.

Dr. Lupica did not suspect child abuse based on her ED examination, *id.* ¶ 62, or contact ACS on the day of the ED visit, *id.* ¶ 63.

### 3. A.K. Visits the Sinai ED on August 9, 2018

Hours later, on August 9, 2018, at approximately 4:55 a.m., the parents brought A.K. to the Sinai ED. *Id.* ¶ 64. The parents' chief concern was that A.K. was not moving her left lower leg, *id.* ¶ 66, which the parents had noticed in the early morning hours, *id.* ¶ 67.

Sinai performed a physical examination. It revealed that A.K. was moving her right lower extremity freely, but that the left lower extremity remained fixed, abducted, and externally rotated. *Id.* ¶ 68. An x-ray of the left tibia, fibula, and femur revealed an "acute traumatic displaced transversely oriented fracture through the proximal to mid left femoral diaphysis." *Id.* ¶ 69.

Sinai also performed a skeletal survey. *Id.* ¶ 70. It revealed "callus formation" on the left 4th, 5th, and 6th ribs, compatible with "subacute left rib fractures." *Id.* ¶¶ 70–71. Dr. Grimm and the Sinai pediatric team were consulted. *Id.* ¶ 72. Dr. Ranade recommended a Pavlik harness, a type of soft splint, for four to six weeks, fitted A.K. for one, and discharged her. *Id.* ¶¶ 73–74. The parents were directed to follow-up with A.K.'s pediatrician the next day and with Dr. Ranade on August 13, 2018. *Id.* ¶ 76.

No one from Sinai contacted ACS that day. *Id.* ¶ 75.

### 4. The Follow-Up Visits to Sinai on August 13 and 14, 2018, and the SCR Report on August 13, 2018

In a follow-up visit on August 13, 2018, Sinai's Dr. Ranade examined A.K. *Id.* ¶ 77. During a physical exam, she noticed tenderness of the clavicle, which she had not noticed the prior week. *Id.* Dr. Ranade recommended that A.K. be admitted to Sinai for a genetic workup.

*Id.* ¶ 78.  A.K. was admitted that same day; imaging of the clavicle was performed and found to be inconclusive.  *Id.* ¶ 80.  No clavicle fracture in A.K. was ever definitively diagnosed.  *Id.* ¶ 81.

That same day, after the examination, Dr. Ranade contacted the New York State Central Registry ("SCR") and filed a report of suspected abuse.  *Id.* ¶ 79.  ACS assigned Rodriguez to investigate the report of abuse of A.K.  *Id.* ¶ 82.  Rodriguez contacted Dr. Ranade by telephone regarding A.K.  *Id.* ¶ 83.  She later interviewed the parents at Sinai accompanied by another ACS employee and two detectives, went to their home, observed the home, and interviewed A.K.'s baby nurse.  *Id.* ¶ 84.

On August 14, 2018, Dr. Grimm examined A.K.  *Id.* ¶ 85.  Dr. Grimm noted that a clavicle fracture had not been confirmed by radiology, *id.* ¶ 86, and observed A.K. lift both arms up spontaneously, *id.*  At the time, Dr. Grimm could not say the baby had nonaccidental trauma.  *Id.* ¶ 87.  She cleared A.K. to go home from Sinai on the understanding that there would be supervision by ACS.  *Id.* ¶ 88.

On August 14, 2018, Rodriguez contacted Dr. Popper by telephone regarding A.K. and documented the conversation in a case note.  *Id.* ¶ 89.  Rodriguez contacted Sinai and spoke with a social worker and Dr. Grimm, who was on the social worker's speaker phone, regarding A.K, and documented the conversation in a case note.  *Id.* ¶ 95.

That same day, Lawson contacted Dr. Popper and Dr. Grimm each by telephone regarding A.K. and documented the conversations in case notes.  *Id.* ¶¶ 90–91.  Lawson also received telephone calls from each of Dr. Ranade, Dr. Hodo, and Dr. Grimm, and documented the conversations in case notes.  *Id.* ¶¶ 92–94.

### 5.        The Visit to HSS on August 23, 2018

On August 23, 2018, HSS's Dr. Fabricant examined A.K. and performed imaging.  *Id.* ¶ 96.  An x-ray of the left femur revealed a healing fracture.  *Id.* ¶ 100.  The plan thus remained

8

to continue treatment using the Pavlik harness. *Id.* ¶ 96. That same day, Dr. Fabricant documented his concern about a femur fracture in such a young infant, noting that such an injury can be caused by either bone disease or "nonaccidental trauma." *Id.* ¶ 97. He also documented that ACS was actively involved in the case and that Glass had been in contact with ACS and Sinai's social work team. *Id.* ¶ 98. He further documented a discussion that he had with the family about the "need to obtain the nonaccidental trauma workup from Mount Sinai, due to the nature of the injury." *Id.* He directed Glass to obtain the Sinai medical records. *Id.* ¶ 99.

6.   **ACS Emails and Discussions with Medical Providers Between August 27 and August 30, 2018, and the SCR Report on August 28, 2018**

Between August 27 and August 30, 2018, numerous doctors corresponded with each other and with ACS regarding A.K. and the possibility of abuse. These included emails between and among Dr. Fabricant, Dr. Platt, Dr. Lupica, and Glass. *See id.* ¶¶ 101–11, 113, 115–17, 121.

On August 28, 2018, Glass filed a report of suspected abuse or neglect with SCR. *Id.* ¶ 112. That night, two ACS employees went to a hotel where the parents were staying, due to renovations at their apartment, to interview them. *Id.* ¶ 114. On August 29, 2018, Rodriguez went to the parents' hotel and told them that a child safety conference ("CSC") had been scheduled the following day. *Id.* ¶ 119. The same day, Rodriguez contacted Glass regarding her report to the SCR, *id.* ¶ 118, and on August 30, 2018, she spoke with Dr. Lupica, *id.* ¶¶ 120, 124.

7.   **The CSC and Ensuing Family Court Proceedings**

On August 30, 2018, the parents, along with various family members and supporters, and a parent advocate, met with ACS staff for a CSC. *Id.* ¶¶ 125–26. ACS recommended that its lawyers initiate removal proceedings in Family Court; later that day, an ACS attorney filed two petitions to this effect (together, the "Petition"), *id.* ¶¶ 127–28; *see, e.g.*, Dkt. 218, Ex. 23; Dkt.

220, Ex. 4; Dkt. 226, Ex. 12; Dkt. 229, Ex. 23 (copies of the Petition),[2] seeking temporary removal of A.K. and her twin, *id.* ¶¶ 125–35. The parents appeared at the Family Court proceeding with counsel, *id.* ¶ 136, and consented to the release of the twins to Rahul Kakar, the twins' maternal uncle who lived on Long Island and who would supervise the parents' interactions with the children, *see id.* ¶ 137. Family Court Judge Patria Frias-Colon thereafter entered two removal orders—one for A.K. and one for M.K—pursuant to Family Court Act ("FCA") § 1027. *Id.* ¶ 138. These ordered that the twins be temporarily placed with their maternal uncle and that the parents could not be alone with the twins, but could spend unlimited supervised time with them. *Id.* ¶¶ 138–39. At this initial Family Court proceeding, the parents' counsel did not request that the court schedule a hearing pursuant to FCA § 1028 seeking return of the children to the parents. *Id.* ¶ 140.

On September 27, 2018, the parents filed an application for an FCA § 1028 hearing, which began that day. *Id.* ¶ 141. During the proceeding, which lasted several days and at which Rodriguez testified, the parents and ACS agreed, on the record, to settle the § 1028 proceeding. *Id.* ¶¶ 142–45. Under this agreement, the twins would be temporarily released to the custody of Apekask Kakar, their maternal grandmother, under ACS's supervision. *Id.* ¶ 145. The maternal grandmother would reside in the parents' home with the parents and the children. *Id.* On October 2, 2018, Judge Frias-Colon entered an order memorializing the agreement. *Id.* ¶ 146.

On April 10, 2019, the parents filed a motion for summary judgment in the Family Court. *Id.* ¶¶ 147–48. ACS's own expert, Dr. Jamie Hoffman-Rosenfeld, later reviewed the records and concluded that the injuries "could have reasonable explanations other than child

---

[2] Citations to the Petition refer to the internal pagination of the document, which is consistent across all versions available in the record.

mistreatment." *Id.* ¶ 149 (internal quotation marks omitted).  On May 7, 2019, ACS withdrew its

Petition, and the Family Court dismissed it with prejudice.  *Id.* ¶¶ 150–51.

**B.      Procedural History of This Action**

**1.      Initiation of the Lawsuit and the Motions to Dismiss**

On May 1, 2020, the parents filed the Complaint, Dkt. 1, and on May 5, 2020, the

Amended Complaint, Dkt. 55, bringing sweeping claims.  They sued the City, ACS, two

hospitals, and many employees of each institution under 42 U.S.C. §§ 1983 and 1985, alleging,

*inter alia*, malicious prosecution, abuse of process, conspiracy, false imprisonment, and violation

of their constitutional rights to family integrity and freedom of association.  They also brought

state-law claims for, *inter alia*, intentional infliction of emotional distress, medical malpractice,

loss of consortium and companionship, and defamation.

Four motions to dismiss followed: on August 14, 2020, by defendants affiliated with

Sinai, *see* Dkt. 89, and with HSS, *see* Dkts. 93, 97; on August 18, 2020, by defendants associated

with the City and ACS, *see* Dkts. 99, 101; and on September 23, 2020, by defendants associated

with Weill Cornell, *see* Dkts. 112, 114.  On November 13, 2020, plaintiffs opposed the motions to

dismiss.  *See* Dkt. 123.  Reply briefs were filed on December 10, 2020, by defendants associated

with Sinai and Weill Cornell, respectively, *see* Dkts. 126, 129; on December 29, 2020, by

defendants associated with Sinai, *see* Dkt. 133; and on January 13, 2021, by defendants

associated with the City and ACS, *see* Dkt. 136.

In its May 24, 2021 decision, the Court substantially granted the motions to dismiss.  *See*

*Kurtz*, 2021 WL 1143619, at *24–25.  The large number of implausibly pled claims, the Court

stated, reflected the "Amended Complaint's grapeshot approach—casting wide claims of

illegality well beyond what the facts could remotely bear."  *Id.* at *12 n.12.

11

The Court dismissed (1) claims against ACS, the New York Comptroller, and the Division of Child Protection because, by statute, those defendants are not suable entities, *id.* at *8; (2) § 1983 claims against several defendants working as private medical professionals because none was plausibly alleged to be a state actor, *id.* at *8–12; (3) § 1983 claims for abuse of process because plaintiffs did not identify "a collateral objective" on the part of any defendant, *id.* at *16–17; (4) §§ 1983 and 1935 conspiracy claims, because the Amended Complaint pled only conclusory facts supporting a conspiracy among any defendants, *id.* at *17; (5) claims of false imprisonment as abandoned by plaintiffs, *id.* at *18; (6) *Monell*[3] claims because the Amended Complaint lacked "any concrete factual allegations from which the existence of an unconstitutional municipal policy, custom, or usage that caused plaintiffs' injuries could be inferred," *id.* at *18–20; and (7) exercising supplemental jurisdiction, state-law claims that tracked dismissed or abandoned federal claims, *id.* at *20–24.

The decision left four claims standing: under federal law, (1) § 1983 claims alleging the "intentional violation of federally protected constitutional rights," against ACS employees and the City, which had not moved to dismiss these claims, *id.* at *18 (quoting Amended Complaint ¶ 258); and (2) § 1983 claims alleging malicious prosecution, against ACS employees and the City,[4] *id.* at *12–16; and under state law, (3) a malicious-prosecution claim, against ACS employees, the City, Dr. Lupica, and Weill Cornell, *id.* at *20–22; and (4) a failure-to-diagnose claim, against Dr. Lupica, Dr. Shaykh, and Weill Cornell, *id.* at *23–24.

---

[3] *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978).

[4] Some such claims would have failed against some individual ACS defendants, but defendants had "not moved specifically as to any individual ACS employees." *Kurtz*, 2021 WL 1143619, at *16 n.15.

### 2. Defendants' Motions for Summary Judgment

The case then proceeded to discovery. On May 4, 2021, the Court entered a case management plan and scheduling order. Dkt. 159. On November 10, 2021, plaintiffs sought to amend their complaint again, Dkt. 183, which the Court later denied, Dkt. 187. On April 18, 2022, the parties filed, and the Court entered, a stipulation of dismissal of all individual claims as against Dr. Shaykh. Dkt. 198. On May 20, 2022, the Court held a pre-motion conference and set a schedule for defendants' motions for summary judgment. *See* Dkt. 206.

On July 7, 2022, Dr. Lupica and Weill Cornell moved for summary judgment, Dkt. 208, and filed a memorandum of law, Dkt. 214. On July 8, 2022, the City, Hansell, Lawson, and Rodriguez moved for summary judgment, Dkt. 219, and filed a memorandum of law, Dkt. 224. On August 5, 2022, plaintiffs opposed both motions. Dkts. 225, 228. On August 19, 2022, all defendants replied. Dkts. 233, 237.

## II. Applicable Legal Standards for a Motion for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation

13

marks and citation omitted). Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III.    Discussion

With the case having narrowed over time, most recently as a result of concessions by plaintiffs in response to the pending motions, the Court first isolates the surviving claims. The Court then addresses these in two parts: those claiming malicious prosecution under federal or state law; and then the state-law medical-malpractice claim for failure to diagnose.

### A.    Surviving Scope of Claims

In four respects, the scope of the claims has narrowed since the resolution of the motions to dismiss. First, during discovery, the parties stipulated to the dismissal of all claims against Dr. Shaykh.[5] *See* Dkt. 198. Second, plaintiffs consented to dismissal of their § 1983 claim of a violation of the family's substantive due process rights. *See* Pl. ACS and City Opp. at 26 n.7. Third, plaintiffs have consented to dismissal of all claims against Hansell. *Id.* Fourth, plaintiffs

---

[5] The stipulation leaves standing any liability owed by Weill Cornell for any negligent acts and/or omissions by Dr. Shaykh "that occurred during the care and treatment of [A.K.] while she was a patient." Dkt. 198 at 2.

have not taken any steps to serve, substantiate, or pursue their claims against numerous John Doe

defendants associated with Weill Cornell, Sinai, and ACS, *see* Dkts. 140 (ordering service or

letter from plaintiffs by April 5, 2021), 145 (no response as to these defendants); the Court thus

dismisses all claims against these defendants without prejudice for failure to prosecute pursuant

to Federal Rule of Civil Procedure 41(b).

The remaining claims therefore consist of: (1) under § 1983, a malicious prosecution

claim against Rodriguez and Lawson; (2) under state law, a malicious prosecution claim against

Rodriguez, Lawson, the City, Dr. Lupica, and Weill Cornell; and (3) under state law, a medical

malpractice claim for failure to diagnose against Dr. Lupica and Weill Cornell.

### B.    Malicious Prosecution Under § 1983 and State Law

The Court addresses the federal and state malicious prosecution claims together, given

their overlapping standards.

To prevail on a § 1983 claim for malicious prosecution, "a plaintiff must show a violation

of his rights under the Fourth Amendment, and must establish the elements of a malicious

prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160–61

(2d Cir. 2010) (citations omitted). "To establish a malicious prosecution claim under New York

law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against

plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for

commencing the proceeding; and (4) actual malice as a motivation for defendant's actions."

*Stampf v. Long Island R.R.*, 761 F.3d 192, 198 (2d Cir. 2014) (quoting *Manganiello*, 612 F.3d

at 161). Under § 1983, state "tort law serves only as a source of persuasive authority rather than

binding precedent in defining these elements." *Lanning v. City of Glens Falls*, 908 F.3d 19, 25

(2d Cir. 2018). A plaintiff must also show "a seizure or other perversion of proper legal

procedures implicating [his] personal liberty and privacy interests under the Fourth

15

Amendment." *Id.* at 24 (quoting *Washington v. County of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004)).

### 1.    Applicable Law on Probable Cause for Child-Removal Proceedings

"[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). "In the context of a malicious prosecution claim, probable cause under New York law is 'the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of.'" *Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994) (citation omitted). "It is a more exacting standard than the standard required to support an arrest." *Emanuel v. Griffin* ("*Emanuel II*"), No. 13 Civ. 1806 (JMF), 2015 WL 1379007, at *8 (S.D.N.Y. Mar. 25, 2015). However, "[b]ecause obviously less in the way of grounds for belief will be required to justify a reasonable [person] in bringing a civil rather than a criminal suit, when the underlying action is civil in nature[,] the want of probable cause must be patent." *Emanuel v. Griffin* ("*Emanuel I*"), No. 13 Civ. 1806 (JMF), 2013 WL 5477505, at *8 (S.D.N.Y. Oct. 2, 2013) (quoting *Fink v. Shawangunk Conservancy, Inc.*, 15 A.D.3d 754, 790 (2005)).

"[T]he issuance of a temporary injunction or similar judicial recognition of the merit of the underlying case creates a presumption of probable cause and places upon the plaintiff the burden of pleading facts sufficient to overcome it." *Emanuel II*, 2015 WL 1379007, at *9 (quoting *Butler v. Ratner*, 210 A.D.2d 691, 693–94 (1994)); *see also Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003) (presumption of probable cause created in criminal case by grand jury indictment). That presumption "is rebuttable, and may be overcome by evidence establishing that the police witnesses 'have not made a complete and full statement of facts . . . [,] that they have misrepresented or falsified evidence[,] . . . or otherwise acted in bad faith.'" *Boyd*, 336 F.3d

at 76 (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82–83 (1983)). Courts "must consider those facts available to the officer at the time of" her actions. *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006). A showing that submissions to a family court were "intentionally or recklessly false, as the result of defendants' conduct" can negate probable cause. *Estiverne v. Esternio-Jenssen* ("*Estiverne II*"), 833 F. Supp. 2d 356, 379 (E.D.N.Y. 2011).

The Court first addresses the malicious prosecution claims against the ACS Defendants and the City and then that against the Medical Defendants.

### 2. ACS Defendants and the City

#### *a.* *The Parties' Positions*

The ACS Defendants and the City argue that, by August 30, 2018, when they filed the Petition for removal, they had evidence that supplied probable cause that A.K. had been the victim of child abuse by her parents. *See* ACS and City Mem. at 1–19. Dominantly, this consisted of two reports expressly alleging suspected child maltreatment: on August 13, 2018, from Dr. Ranade of Sinai, and on August 28, 2018, from social worker Glass, who had consulted with Dr. Fabricant of HSS. *Id.* at 8. It also included the reported concerns about A.K.'s treatment from other doctors across three hospitals—Dr. Hodo of Mount Sinai, the doctors from HSS whom Glass's report canvassed, and Dr. Lupica of Weill Cornell. *Id.* at 8 nn.2–5. To varying degrees, these professionals articulated concerns about the source of A.K.'s femur fracture, specifically that it might have resulted from non-accidental trauma. *Id.* at 8–9. Separately, Dr. Ranade and Glass, whose written reports to ACS made the abuse allegations, had "reported concerns about the possible clavicle fracture," and Dr. Ranade, Glass, and Dr. Grimm had "all mentioned healing rib fractures, which may or may not have been sustained while A.K. was in the NICU." *Id.* at 9.

The parents dispute that these reports gave the ACS Defendants and the City probable cause to initiate the removal of their children. However, the focus of their opposition is their claim that ACS acted in bad faith—distorting these reports and making reckless and intentional falsehoods in seeking an order of removal. ACS personnel, they contend, "knew from the outset" that was no evidence of child abuse, but "lied to the Family Court about the results of their investigation, concealed exculpatory evidence, and misrepresented the opinions of the medical experts whom they had interviewed, in order to coax the Family Court into removing plaintiffs' children." *See* Pl. ACS and City Opp. at 1, 13–24. Claiming that a jury on this basis could find a lack of probable cause, they oppose summary judgment.

b.    Analysis

The Court, in resolving the motions to dismiss, previously addressed a similar argument. The ACS Defendants and the City argued that a presumption of probable cause arose from the Family Court's decision; and that based on the pleadings and cognizable materials, probable cause supporting the children's removal necessarily existed. *Kurtz*, 2021 WL 1143619, at *12–16; *see, e.g.*, *Boyd*, 336 F.3d at 76; *Emanuel II*, 2015 WL 1379007, at *9. The Court recognized that argument as substantial: The City had "a solid basis to argue that probable cause existed," *Kurtz*, 2021 WL 1143619, at *15, in that multiple doctors and a social worker had reported abuse and the Family Court's decision, based on those reports, had found removal justified. *Id.* But, although the question was close, the Court held, the parents had pled facts sufficient to rebut that presumption, and to require that the existence of probable cause be tested in discovery. Specifically, the parents had plausibly pled that ACS had falsely represented to the Family Court that x-rays of A.K. were "inclusive" of clavicle injuries. This statement, which tended to reinforce the conclusion of abuse, was contradicted by Drs. Grimm and Ranade's opinions—known by but not reported by ACS—that there had not been a clavicle fracture. *Id.* On this

basis, the Court held, the parents "have plausibly pled that [the ACS Defendants and the City], in seeking the infants' removal, included materially false statements and were reckless in presenting information to the [F]amily [C]ourt." *Id.*

With discovery complete, the Court now returns to the issue of probable cause, but with defendants' motions subject to the different legal framework attendant to a summary judgment motion. It is no longer enough for the parents to plead bad faith, and intentional and knowing misstatements, on the part of ACS. For their claims to survive, the parents must now adduce sufficient evidence on which a jury, were the evidence otherwise to supply probable cause, could find bad faith misconduct by these defendants. In fact, despite nearly a year of discovery, the parents have not adduced any evidence of the sort.

At the outset, the Court notes the obvious: That, absent evidence of such misconduct, the information that ACS had, and put before the Family Court, not only supplied probable cause of child abuse by the parents—it did so by a comfortable margin. The ACS Defendants and the City based their conclusion of likely parental child abuse on two reports expressly alleging the abuse of A.K. (from Dr. Ranade and Glass). These were backed, in varying degrees, by medical records and observations from other doctors. This information came from professionals across three institutions—Dr. Lupica from Weill Cornell; Drs. Grimm, Ranade, Hodo, and Popper from Sinai; and Dr. Fabricant and social worker Glass from HSS.

To be sure, these professionals did not draw unitary conclusions as to the strength of the evidence of abuse. No professional described the case, which was wholly circumstantial, as a slam-dunk. But two reports squarely concluded that there had been parental child abuse: Dr. Ranade's August 13, 2018, and Glass's August 28, 2018, reports, the latter of which drew upon inputs from multiple doctors and records. *See* JSF ¶¶ 79, 105–112. And doctors from three

different hospitals—Dr. Ranade and Dr. Hodo of Sinai, Glass (reporting the views of doctors at HSS), and Dr. Lupica of Weill Cornell—expressed degrees of concern about the origins of A.K.'s femur fracture. *See* Dkt. 220, Exs. 1 ("August 13 SCR Report") at 4, 2 ("August 28 SCR Report") at 3; *see generally id.*, Ex. 3 ("ACS Investigative Notes").

Furthermore, as the reports from Dr. Ranade and Glass reasoned, the circumstances surrounding the femur fracture gave rise to a reasonable inference of abuse. As Drs. Ranade and Lupica—and Glass, reporting the HSS doctors' views—explained, a femur fracture in an infant was unlikely to have been caused by simply dropping her, as Kurtz claimed he had done. *See* August 13 SCR Report; August 28 SCR Report. Dr. Lupica stated that the type of fracture that A.K. had sustained is "usually seen by someone pulling the child['s] leg or a direct impact." ACS Investigative Notes at 32.[6]

Also supporting probable cause was evidence of possible other injuries to the approximately two-month-old A.K. Dr. Ranade and Glass both reported concerns about the possible clavicle fracture. *See* August 13 SCR Report at 4; August 28 SCR Report at 3. And Drs. Ranade and Grimm, and Glass, all noted evidence of healing rib fractures. Although these might have been sustained not on the parents' watch, but earlier, while A.K. had been in the NICU, there was no affirmative evidence of such an incident at the NICU.

---

[6] Although significant only to the assessment of Dr. Lupica, the sequence of events immediately preceding the fractured femur diagnosis also could be read as suspicious. The parents had reported at the initial visit that Kurtz had dropped A.K., but they had not specifically alleged a leg injury. And Dr. Lupica, the original treating physician at Weill Cornell, had not observed indications—physical or behavioral—of a femur injury. Five and a half hours later, the parents, without reporting an intervening traumatic event, then brought A.K. to a different hospital, HSS, which diagnosed the femur fracture. The parents contend that Dr. Lupica, in an act separately pled as malpractice, failed to spot the femur fracture. But, from Dr. Lupica's perspective, in which there had no been no indication of femur injury hours earlier, the inference naturally arose that a trauma of some sort—unrevealed by Kakar and Kurtz—had befallen the infant in the five-plus hours after A.K.'s discharge from Weill.

Finally, as the ACS investigative notes reflected, the ACS Defendants had proceeded with deliberation. They—in addition to Glass—had met or discussed the case with various doctors multiple times: Dr. Grimm (thrice), Dr. Ranade (twice), Dr. Hodo (once), Dr. Lupica (once), and Dr. Popper (twice). *See* JSF ¶¶ 83–84, 89–95, 98, 118–20. Under these circumstances, the evidence gave ACS a reasonable and solid basis, comfortably exceeding the threshold for probable cause, to conclude that A.K. had been abused. Consistent with this, the Family Court granted ACS's Petition for removal, bespeaking its determination to the same effect. The rebuttable presumption here of probable cause, *see, e.g.*, *Boyd*, 336 F.3d at 76; *Emanuel II*, 2015 WL 1379007, at *9, was thus here more than a theoretical construct. The evidence of abuse set out in ACS's Petition to the Family Court readily cleared this standard. *See, e.g.*, *Emanuel I*, 2013 WL 5477505, at *7 (finding probable cause of abuse); *Shapiro v. Kronfeld*, No. 00 Civ. 6286 (RWS), 2004 WL 2698889, at *18 (S.D.N.Y. Nov. 24, 2004) (same); *see also Johnson v. City of New York*, No. 20 Civ. 3083 (GBD) (BCM), 2022 WL 6564685, at *12 (S.D.N.Y. Aug. 12, 2022), *report and recommendation adopted*, 2022 WL 4364879 (S.D.N.Y. Sept. 21, 2022).

In these circumstances, for the malicious prosecution claims against the ACS Defendants and the City to move forward to trial, the parents must adduce evidence of bad faith sufficient to negate probable cause. This requires evidence on which a reasonable factfinder could find that misrepresentations in or omissions from ACS's Petition resulted in its being "intentionally or recklessly false." *Estiverne II*, 833 F. Supp. 2d at 379; *see also Panetta*, 460 F.3d at 395. The parents identify four such ostensible omissions or misrepresentations.

First, they argue, the Petition for removal omitted material exculpatory evidence, namely the opinions of Drs. Grimm and Popper as to the sources of A.K's injuries. Second, they argue,

ACS caseworker Rodriguez lied about Dr. Grimm's opinion to the Family Court prosecutor,

Dana Licandro, in stating that Dr. Grimm had not yet formed an opinion whether there was

evidence of child abuse.  Third and fourth, they argue, Rodriguez made two misrepresentations

to the Family Court about opinions of Dr. Ranade, in that she falsely stated that Dr. Ranade had

termed A.K.'s injuries "inconsistent" with the parents' account of the accident; and had told CPS

that the x-rays of the collarbone came back "inclusive" of a clavicle fracture.  Pl. Opp. ACS and

City Mem. at 13–14.  The Court reviews the parents' four theories of intentional or reckless

falsehoods.

> ***Omission of the views of Drs. Grimm and Popper***:  Drs. Grimm and Popper spoke or

met with ACS on multiple occasions, conveying their findings as to the nature and circumstances

of A.K.'s actual or possible femur, rib, and clavicle injuries.  ACS took contemporaneous notes

memorializing these conversations.

As to Dr. Grimm, who examined A.K. on August 14, 2018, JSF ¶ 85, ACS's

investigative notes reveal that she communicated her views to ACS in phone calls on August 14,

2018 with Lawson.  The thrust of her statements on these calls was that there were no signs of

abuse, the femur fracture had resulted from accidental trauma, and the rib fractures could have

occurred in the NICU or at home.[7]

---

[7] *See* ACS Investigative Notes at 18–19 ("Dr. Grimm stated she does not feel this baby was abused. . . . Dr. Grimm states that what is influencing her about this incident being accidental, is that the baby was premature and fragile.  She examined baby A.K. and when both arms were lifted, the child did not appear to be in pain."), 20 ("Dr. Grimm called to say that she reviewed baby A.K.'s x-rays and saw that both clavicles look the same . . . . Dr. Grimm states the femur fracture is from the baby falling to the tile floor.  Dr. Grimm further stated the rib fractures will take care of themselves in regards to the healing process and that no one can testify at this time to say this infant was abused."), 21 ("[ACS] inquired what is Ms. Grimm['s] medical opinion.  Ms. Grimm stated at this time more test[ing] needs to be conducted.  The baby has old healing rib fractures that may have occurred when she was in the N[I]CU or at home.  It is hard to

As to Dr. Popper, who was A.K.'s pediatrician, ACS's notes reveal that she communicated her views to ACS through phone calls to Rodriguez and Lawson. JSF ¶¶ 89–90. The thrust of these calls, too, was that there had not been abuse. To Rodriguez, Dr. Popper stated that A.K.'s "parents are fantastic people," and "[w]hat happened with [A.K.] last week was an accident." ACS Investigative Notes at 16. Dr. Popper also based this conclusion on her decades of medical practice.[8]  That said, Dr. Popper noted that the two theoretically possible explanations for A.K.'s injuries were that "there [is] something wrong with [A.K.]" or that "someone did something," and stated that further testing and evaluation was in order.[9]  In a later call with Lawson, Dr. Popper, however, disavowed the possibility of "[two] different stories," and reaffirmed her belief that there had not been abuse, while stating that she understood why the case had been reported to ACS as involving abuse.[10]

The parents argue that, in not including in its Petition the "findings" of Drs. Grimm and Popper that there had not been abuse, ACS "deliberately omitted material exculpatory evidence from the removal Petition." Pl. ACS and City Opp. at 13. The ACS Defendants, the parents

---

pinpoint where it occurred and how.  [ACS] inquire[d] about the leg fracture.  Ms. Grimm stated more test[ing] needs to be done to determine whether it is abuse or not.").

[8] ACS Investigative Notes at 17 ("Dr. Popper stated she has more than 40 years of practicing medicine.  She has reported several cases of abuse in her profession.  She will personally stake her 40 years of experience and reputation[, a]s well as standing with the parents['] story.").

[9] ACS Investigative Notes at 17 ("Dr. Popper stated there are two possible explanation[s] for [A.K.'s] injuries.  CPS ask[ed] what are they.  Dr. Popper said there something wrong with [A.K.] or someone did something.  CPS inquire[d] how can CPS know which one is it.  Dr. Popper stated the hospital and herself are working together in performing several test and evaluation on [A.K.].  The results of the test will take several weeks.").

[10] ACS Investigative Notes at 18 ("Dr. Popper states she would not have reported this case until she had more information to determine whether this is abuse but she understands why it was reported.").

state, thereby "deprived Judge Frias Colon of the opportunity to make a valid assessment as to whether any child abuse had occurred." *Id.* at 18.

This argument falls short. The Second Circuit has specifically rejected that ACS caseworkers have a duty to present exculpatory evidence in Family Court proceedings. *See Cornejo v. Bell*, 592 F.3d 121, 129 (2d Cir. 2010) (finding no constitutional violation where "the heart of the complaint . . . is that [ACS] failed to adequately apprise the Family Court of exculpatory information"); *Walden v. Wishengrad*, 745 F.2d 149, 152 (2d Cir. 1984) (same); *Williams v. Savory*, 87 F. Supp. 3d 437, 455 (S.D.N.Y. 2015) (same). As such, the non-inclusion in ACS's Petition of the view of these two doctors that there had not been abuse does not, without more, give rise to an inference of an intentional or reckless falsehood. On the contrary, as a charging instrument, a Petition is required merely to "allege[]" "facts sufficient to establish that a child is an abused or neglected," FCA § 1031(a), not to canvass all relevant or potentially relevant evidence; *see also id.* § 1031(d) ("[T]he petition shall allege facts sufficient to establish that the return of the child to the care and custody of his parent or other person legally responsible for his care would place the child in imminent danger of becoming an abused or neglected child."). The Petition here did so.

Critically, with the benefit of discovery, the parents have not adduced evidence that the "omissions" of the two doctors' views were knowing or intentional falsehoods on the part of ACS Defendants. The parents have not adduced any evidence whatsoever as to ACS supervisor Lawson's state of mind. And as to child protective specialist Rodriguez, the parents extract from her lengthy deposition testimony only the statement that she knew that Dr. Grimm's opinion was "important." Dkt. 226, Ex. 10 at 164. That portrait takes Rodriguez's testimony out of context. Rodriguez's full statement was that "all the doctors are important to the case." *Id.* That truism

does not give rise to an inference that Rodriguez, by not reporting Dr. Grimm's opinion, was knowingly or intentionally making the Petition false.

More fundamentally, given the formidable other data they had amassed, Rodriguez (and her colleague Lawson) had a solid basis in evidence, notwithstanding the two doctors' contrary views, on which to conclude that there had been abuse, and to seek removal, having "generated significant information supporting a finding of abuse." *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 106 (2d Cir. 1999). This data included Glass's August 28, 2018 report of suspected child abuse, which came later in time and was reasonably viewed as taking into account all preceding assessments. They were not obliged to report all contrary views.[11]

In sum, the parents have not come forward with any basis on which a reasonable finder of fact could conclude, other than speculatively, that omission of the views of Drs. Grimm and Popper made ACS's Petition false, let alone intentionally or recklessly so, on the part of ACS's Lawson and Rodriguez. And, beyond faulting ACS for not including these views, the parents do not point to any part of the Petition that falsely implied that were no contrary views, or other statements that were made misleading by the omission of the views of Drs. Grimm and Popper. On this a reasonable jury could not find intentional or reckless falsity or "disregard for the truth." *United States v. Perez*, 247 F. Supp. 2d 459, 472 (S.D.N.Y. 2003); *see also Morse v. Fusto*, 804 F.3d 538, 544 (2d Cir. 2015).

---

[11] Although not necessary to this decision, there was sound reason on its face to discount the opinion of pediatrician Dr. Popper, insofar as it appeared to derive from his character assessment that the parents of his infant patients were "fantastic people." An ACS caseworker could, without any malice, find more persuasive the forensically based assessments of other medical professionals, such as the doctors cited in the Petition.

***Rodriguez's statements to Licandro regarding Dr. Grimm's opinion:*** In deposition

testimony,[12] Rodriguez recounted, as follows, her discussion with Family Court prosecutor

Licandro about Dr. Grimm's opinion:

> Q:  Did you ever mention to Ms. Licandro the opinions expressed by Dr. Katherine
> Grimm?
> A:  Yes.
> Q:  What did you tell her about those opinions?
> A:  *I let her know that Dr. Grimm has made a communication with the agency since
> the case came in, and Dr. Grimm has stated that she cannot say whether it's abuse
> or not because some tests still need to be done.  So until all the tests are not done
> on the baby, she cannot say whether it's abuse or not.*
> Q:  So you told Dana Licandro that Dr. Grimm couldn't say whether or not there
> was abuse that had taken place; is that your testimony?
> A:  Yes.
> Q:  Did you ever tell Ms. Licandro that Dr. Grimm actually said there was no abuse
> that had taken place?
> A:  I don't remember.
> Q:  Did you ever tell Ms. Licandro that Dr. Grimm had said this was an unfortunate
> accident?
> A:  Don't remember.

Dkt. 236, Ex. 1 at 3–4 (emphasis added).

In claiming intentional falsity so as to salvage their malicious prosecution claims, the parents

contend that Rodriguez's statement to Licandro that Dr. Grimm was agnostic as to whether abuse

had taken place was a "lie," because in fact, the parents contend, Dr. Grimm had been "certain

on day one that no abuse had occurred." *Id.*

The parents' overheated characterization of Rodriguez's statement to Licandro as a "lie"

is easily put aside.  ACS's contemporaneous notes of Rodriguez's conversation with Grimm are

not a model of clarity.  But they can comfortably be read to support the proposition that Dr.

---

[12] Plaintiffs and ACS Defendants have each submitted portions of Rodriguez's deposition
testimony. *See, e.g.*, Dkt. 226, Ex. 10 (plaintiffs); Dkt. 236, Ex. 1 (ACS Defendants).  The Court
reviews the totality of Rodriguez's testimony.

Grimm, pending further testing, had not firmly settled on an opinion.  In pertinent part, the notes

read:

> [ACS] inquired what is Ms. Grimm medical opinion.  Ms. Grimm stated at this time
> more test[ing] needs to be conducted.  The baby has old healing rib fractures that
> may have occurred when she was in the N[I]CU or at home.  It is hard to pinpoint
> where it occurred and how.  [ACS] inquire[d] about the leg fracture.  Ms. Grimm
> stated more test[ing] needs to be done to determine whether it is abuse or not.

*See* ACS Investigative Notes at 21–22.  Dr. Grimm's statements that "[i]t is hard to pinpoint

where it occurred and how" and that "more test[ing] needs to be done to determine whether it is

abuse or not" gave Rodriguez a particularly solid basis on which to draw the conclusion she

communicated to Licandro.  To be sure, elsewhere in the notes of the same conversation are

statements from Dr. Grimm that express the view that there had not been abuse.  *See supra* note

7.  But, critically, the parents' burden in pursuing a claim of malicious prosecution is to establish

an intentional or reckless falsehood undermining the evidence of probable cause.  That burden is

not met by critiquing as imperfect or incomplete child protective specialist Rodriguez's

deconstruction of the mash-up of internally contradictory quotes taken from Dr. Grimm.  The

parents have not come forward with evidence that Rodriguez's summary to Licandro, supported

by statements in the ACS notes, was intentionally or recklessly false.  A finder of fact could so

conclude only based on speculation.

> ***The Petition's characterization of two aspects of Dr. Ranade's opinion:*** The Petition

states the following:

> According to Dr. Ranade, the pediatric orthopedic surgeon, the subject child [A.K.]
> (DOB: /18) also presented with injuries to her collarbone.  Dr. Ranade reported that
> she took further x-rays and that they all came back inclusive.  According to Dr.
> Ranade, the injuries the child [A.K.] (DOB: /18) sustained are inconsistent with the
> explanation given by the respondents.

Petition at 6.  The parents accuse Rodriguez of intentionally deceiving the Family Court with this statement by misrepresenting, in two respects, what Dr. Ranade had told her.  Pl. ACS and City Opp. at 20.  First, they contend, Rodriguez failed to disclose that Dr. Ranade had opined "that there were two possible causes of the baby's fractures, one of which was genetic in nature." *Id.* at 20–21.  Second, they contend, Rodriguez falsely claimed that Dr. Ranade had told ACS that the x-rays of the collarbone had come back "inclusive" of—that is, demonstrating—a clavicle fracture.  *Id.* at 9; *see* JSF ¶ 133.

The first of these attacks is easily put aside.  Dr. Ranade's own SCR report, which was supplied to ACS and Rodriguez, supports virtually verbatim the Petition's statement that according to Dr. Ranade, the injuries A.K. sustained "are inconsistent with the explanation given by the respondents."  August 13 SCR Report at 4.  Dr. Ranade there wrote: "A.K. presented to the emergency room with a transverse femur fracture of the left leg. *The nature of the injury is inconsistent with the explanation that the child fell to a tile floor.*  A.K. also has a possible right clavicle fracture that is new since Thursday."  *Id.* (emphasis added).  And when Rodriguez interviewed Dr. Ranade the same day, JSF ¶ 83, she told Rodriguez that although it is "a possibility" that A.K.'s leg injury had been caused by a fall, such "is not common," and that if A.K. had fallen to the floor, "she would have mor[e] injuries," ACS Investigative Notes at 2–3.  On August 14, 2018, Dr. Ranade called Lawson, JSF ¶ 92, and again opined that the injuries were not well-explained by the father's story, ACS Investigative Notes at 19 ("CPM asked if the father dropping the infant on the floor would cause these specific injuries to the baby.  Dr. Ranade said it's possible but not typical for those injuries.").  These statements gave Rodriguez an ample basis on which to represent to the Family Court that, according to Dr. Ranade, A.K.'s injuries were inconsistent with the parents' account.

28

Insofar as the parents fault Rodriguez for not adding that Dr. Ranade "recommended that A.K. be admitted to Sinai for genetic workup," JSF ¶ 78, or that brittle bone disease had been considered as a possible explanation, *see* Dkt. 226, Ex. 10 at 74–76, there was no obligation on Rodriguez's part to include these facts. As noted, there is no legal duty to include exculpatory evidence in a Family Court Petition. And the recommendation by Dr. Ranade that there be further exploration of possible alternative causes was not, in any event, exculpatory *evidence*. Not including this recommendation did not make the Petition misleading in recounting that Dr. Ranade had found the parents' "explanation" "inconsistent" with A.K.'s injuries.

In all events, the parents have not identified any basis on which a finder of fact could conclude that Rodriguez's accurate recitation of Dr. Ranade's stated opinion was false, let alone intentionally or recklessly false. *See Johnson*, 2022 WL 6564685, at *12 ("None of these alleged omissions, singly or in the aggregate, shows that defendants' submissions to the family court were intentionally or recklessly false, as the result of defendants' conduct, as required to rebut the presumption of probable cause." (internal quotation marks omitted)); *see also Estiverne II*, 833 F. Supp. 2d at 379.

The parents' final basis to sustain the malicious prosecution claims against the ACS Defendants and the City is Rodriguez's use of the term "inclusive" in the Petition. Defendants acknowledge that the Petition was inaccurate on this point. Rather than stating that Dr. Ranade had reported that the further x-rays had come back "inclusive," defendants admit, the Petition should have used the word "inconclusive." ACS and City Mem. at 4. That falsity was the basis on which the Court sustained this claim at the pleading stage. Although this "awkward locution as to this key point" could have a benign explanation, the Court held, it could not "assume this on a motion to dismiss." *Kurtz*, 2021 WL 1143619, at *15.

29

With the benefit of discovery, however, the parents have not, adduced evidence that this word-choice error was intentional, reckless, or anything other than inadvertent. Rodriguez has squarely opined that the error resulted from her misunderstanding of the word, and the fact that English is her second language. Dkt. 220 ¶ 13. The parents have not come forward with evidence—including reasonably drawn circumstantial inferences from admissible evidence—impeaching that representation or showing Rodriguez's bad faith. And in opposing the motion for summary judgment on the claims they have brought, the parents have the responsibility to come forward with evidence on which a jury could find for them on each malicious prosecution element, including—via a showing of bad faith—that probable cause for removal was lacking.

The parents highlight that Licandro, relying on what ACS had represented in the Petition, "repeatedly told the Family Court judge that the clavicle fracture had, in fact, been *confirmed* by doctors who had examined A.K." Pl. ACS and City Opp. at 19 (internal citations omitted) (emphasis in original).[13] But that is evidence of the materiality of the false statement about the clavicle injury—its capacity to influence the Family Court—which is not in dispute on this motion. It is not evidence of Rodriguez's state of mind.[14]

There is, further, circumstantial evidence supporting that Rodriguez's error in eliding "inclusive" for "inconclusive" was inadvertent as opposed to in bad faith. As is undisputed,

---

[13] *See* Dkt. 229, Ex. 22 at 8 ("Most medical staff were able to take x-rays and were able to see that there was also a collarbone fracture."); *id.* at 11 ("However, she does have a collarbone fracture and a fracture to her femur"); *id.* at 19 ("So Your Honor, at that time [August 13], they had confirmed the femur, the ribs and then they had confirmed the collarbone [fracture] at that time.").

[14] Licandro's state of mind is not at issue. Plaintiffs have not sued her or claimed that she acted recklessly in relying on—and not vetting—this aspect of the Petition. Had such a claim been brought, prosecutor Licandro would have had a substantial basis to claim absolute immunity. *See Cornejo*, 592 F.3d at 128.

Rodriguez told Licandro that a different doctor, Dr. Grimm, "could not determine if abuse had occurred." JSF ¶ 130. Insofar as Rodriguez did not have a duty to report that fact, her doing so sits uneasily alongside the parents' unsupported accusation that she acted in bad faith in using the word "inclusive" with respect to clavicle injury.

The assembled record, in sum, does not contain evidence supporting that Rodriguez acted intentionally or recklessly, or otherwise in bad faith, with respect to the errant use of the word "inclusive," rather than "inconclusive," in the Petition. *See Salahuddin v. Goord*, 467 F.3d 263, 282 (2d Cir. 2006) (affirming grant of summary judgment for defense where plaintiff could not identify record evidence creating a genuine dispute as to defendant's mental state); *cf. McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004).

The ACS Defendants and the City thus are entitled to summary judgment on the parents' malicious prosecution claims. The evidence adduced establishes, as a matter of law, that there was probable cause to grant the Petition for removal. The parents have not adduced evidence that would permit a finder of fact to conclude otherwise. Because probable cause "is a complete defense" to malicious prosecution, *Savino*, 331 F.3d at 72, the claims of malicious prosecution against these defendants cannot stand.

### c.    *Qualified Immunity*

Independently, in light of the analysis above, the individual ACS Defendants—Lawson and Rodriguez—are also entitled to summary judgment on the malicious prosecution claims on qualified immunity grounds.

As the Second Circuit has recognized, "summary judgment should . . . be 'readily available to . . . [protective services] caseworkers in proper cases under the qualified immunity doctrine.'" *Cornejo*, 592 F.3d at 128 (quoting *Tenenbaum v. Williams*, 193 F.3d 581, 597 (2d Cir. 1999)). "In cases of suspected child abuse . . . caseworkers are often faced with the choice

31

of interrupting parental custody and possibly being accused of infringing a parent's constitutional rights, or not removing a child and possibly infringing the child's rights.  To balance these concerns, courts give caseworkers 'unusual deference' and impose few concrete restrictions on their exercise of discretion." *Emerson v. City of New York*, 740 F. Supp 2d 385, 391 (S.D.N.Y. 2010) (citing *Kia P. v McIntyre*, 235 F.3d 749, 758 (2d Cir. 2000) and *Wilkinson*, 182 F.3d at 104)).  In the context of child-removal proceedings specifically, "because the law contemplates a careful balancing of interests, a parent's substantive constitutional rights are not infringed if a caseworker, in effecting a removal of a child from the parent's home, has a reasonable basis for thinking that a child is abused or neglected." *Southerland v. City of New York*, 680 F.3d 127, 152 (2d Cir. 2012).  The "reasonable basis test" requires that caseworkers' decisions to substantiate an allegation of child abuse "be consistent with some significant portion of the evidence before them." *Wilkinson*, 182 F.3d at 108.

As reviewed above, the Petition had an ample such basis in evidence.  *Id.*  Although the views of the doctors were not uniform, the two SCR reports that explicitly concluded that there had been abuse, and the sound circumstantial logic behind this conclusion as articulated in those reports, gave child protective specialist Rodriguez and her supervisor Lawson a "reasonable basis" for suspecting abuse and thereby filing the Petition. *Southerland*, 680 F.3d at 152.

That conclusion is unaffected by the ultimate outcome of the proceedings here, in which ACS eventually backed away from its claim of child abuse.  Even "[w]here a case[] worker's action concerning removal of infant from parent's custody is 'incorrect or ill-advised' or where an investigation is 'faulty,' such deficiencies do not rise to the level of an unconstitutional investigation, provided that the case[] worker's action is 'consistent with some significant portion of the evidence before [her].'" *Orlik v. Dutchess County*, 603 F. Supp. 2d 632, 647

(S.D.N.Y. 2009) (quotation omitted); *see also V.S. v. Muhammad*, 595 F.3d 426, 431 (2d Cir. 2010) (even if caseworker had been aware that the presiding doctor had a "reputation" for over-diagnosing child abuse, it was not unreasonable to rely on the doctor's diagnosis when her opinion was shared by other doctors). Rodriguez's non-inclusion of the competing conclusions of Drs. Grimm and Popper also does not deny her qualified immunity. "The Second Circuit has held that sins of commission and omission in what [caseworkers] told and failed to tell [a] Family Court Judge are insufficient to overcome the necessary freedom of action that qualified immunity accords caseworker defendants dealing with evolving and dangerous domestic abuse situations." *Walker v. City of New York*, 63 F. Supp. 3d 301, 312 (E.D.N.Y. 2014) (internal quotations omitted), *aff'd*, 621 F. App'x 74 (2d Cir. 2015).

And, as the Second Circuit has observed,

> though a decision to remove a child from parental custody implicates the constitutional rights of the parents, it obliges protective services caseworkers to choose between difficult alternatives in the context of suspected child abuse. . . . It is precisely the function of qualified immunity to protect state officials in choosing between such alternatives, provided that there is an objectively reasonable basis for their decision, whichever way they make it.

*Van Emrik v. Chemung Cnty. Dep't of Soc. Servs.*, 911 F.2d 863, 866 (2d Cir. 1990).

Therefore, the individual ACS Defendants, Rodriguez and Lawson, are entitled to summary judgment on the malicious prosecution claims on a separate ground: qualified immunity.

### 3. Medical Defendants

The plaintiffs pursue under state law a claim of malicious prosecution against the Medical Defendants.[15] The Medical Defendants pursue summary judgment on that claim,

---

[15] The Court has exercised, and continues to exercise, supplemental jurisdiction over this claim, and the parents' medical malpractice claim addressed *infra*, given their close relationship to the § 1983 malicious prosecution claim brought against the ACS Defendants.

arguing that the evidence would not permit a reasonable juror to find that they "initiated" the prosecution. Medical Def. Mem. at 12–13. Under New York law, "[t]he mere reporting of a crime to police and giving testimony are insufficient" to establish liability for malicious prosecution. *Estiverne v. Esernio-Jenssen* ("*Estiverne I*"), 581 F. Supp. 2d 335, 348 (E.D.N.Y. 2008) (quoting *Present v. Avon Prods., Inc.*, 253 A.D.2d 183, 189 (1999)). Such is so even if a defendant gave "false information to the authorities." *Id.* (quoting *Lupski v. County of Nassau*, 32 A.D.3d 997, 998 (2006)). Instead, it must be shown that, at the time the information was provided, the defendant knew it to be false. *Lupski*, 32 A.D.3d at 998; *see Emanuel I*, 2013 WL 5477505, at *7; *Estiverne I*, 581 F. Supp. 2d at 347–49.

Here, the Medical Defendants argue that the evidence would not permit a finding that, when Dr. Lupica made child abuse allegations to ACS, she knew these to be false. Medical Def. Mem. at 14. Dr. Lupica's basis for making that allegation is that, when A.K. first was examined at the Weill Cornell ED on August 8, 2018, and seen by Dr. Lupica, she was not found to have a femur fracture, but that approximately 5.5 hours later, when A.K. was seen at Sinai, the fracture was apparent from an x-ray. JSF ¶ 69. On that basis, Dr. Lupica, on August 30, 2019, told Rodriguez that there was "no way" A.K. had had the femur break when first seen at Weill Cornell, the implication being that some intervening trauma, undisclosed by the parents, must have befallen A.K. *See* Petition at 6–7 ("Dr. Lupican [sic] has reported that there is no way that the baby had a leg fracture on the time she was seen at [Weill] Cornell based on the symptoms she displayed . . . . [I]t is her medical opinion that the injuries sustained did not occur at the time or in the way that the respondents reported."); *see also Lupski*, 32 A.D.3d at 998.

The Medical Defendants have a substantial argument on this point. It is possible, as the parents contend, that the femur fracture predated A.K.'s visit to the Weill Cornell ED but was

overlooked—missed—by Dr. Lupica. If so, the inference of abuse based on the fracture's sudden unexplained emergence (as opposed to other factors on which other doctors later relied in opining that there had been abuse) would go away. But the parents need more to hold Dr. Lupica liable for malicious prosecution based on her statement of opinion to ACS on August 30, 2018 that there had been child abuse: evidence that Dr. Lupica did not believe that statement of opinion to be true at the time she made it. And although the parents have accused Dr. Lupica of a lapse in failing to spot the femur fracture, Dr. Lupica has never acknowledged that the femur fracture was present when she examined A.K. Nor have the parents mustered evidence affirmatively proving that point, which remains in dispute. *See infra* Section III.C.3(a). Accusations aside, the parents have not come forward with evidence on which to contend, non-speculatively, that Dr. Lupica's opinion that there had been child abuse was other than sincere when given to ACS.[16]

The Court, however, need not definitely resolve that issue, because the Medical Defendants are entitled to summary judgment on a separate ground: the existence of probable cause as to the proceeding *on the whole*. That is equally a "complete defense" for the Medical Defendants as it is for the ACS Defendants and the City.

"[A] defendant may meet its burden with respect to that element of a civil malicious prosecution claim by demonstrating that probable cause existed for the prior proceeding as a whole." *Perryman v. Village of Saranac Lake*, 839 N.Y.S.2d 290, 291–92 (2007) (dismissing a

---

[16] The parents conceivably might cite as support Dr. Platt's later email to Dr. Fabricant stating that the failure to diagnose the femur fracture initially had been a "definite miss on our part." Dkt. 229, Ex. 19 at 10. However, Dr. Platt's email appears to have presupposed—as opposed to independently determining on a basis unknown—that the femur fracture had been present at the time of the Weill Cornell ED visit. In this same email, Dr. Platt noted that "the history was not as clear as the parents are presenting now." *Id.* at 9–10.

malicious prosecution cause of action based on prior civil litigation where "at least some causes of action in the underlying complaint" had "potential merit"); *see Engel v. CBS*, 93 N.Y.2d 195, 204 (1999) (for a malicious prosecution claim to succeed, there must be an "entire lack of probable cause"); *Burt v. Smith*, 181 N.Y. 1, 6 (1905) ("If probable cause exists, it is an absolute protection against an action for malicious prosecution, even when express malice is proved. Thus an innocent person may be prosecuted unjustly and subjected to expense and disgrace with no right to call the prosecutor to account, provided he acted upon an honest and reasonable belief in commencing the proceeding complained of."); *cf. Wilhelmina Models, Inc. v. Fleisher*, 797 N.Y.S.2d 83, 85 (2005) ("[T]he falsity of one allegation of a complaint does not support an inference of malice where there existed probable cause for the underlying action as a whole." (internal citation omitted)).

Here, for the reasons canvassed above, ACS's pursuit of removal in its Petition was amply supported by probable cause. Dr. Lupica's opinion, which was largely based on, from her perspective, the unexplained emergence of the femur fracture 5.5 hours after the initial visit to the Weill Cornell, was only one of several opinions cited in the Petition as supportive of its finding of likely child abuse. *See, e.g.*, JSF ¶ 133. And Dr. Lupica's opinion was decidedly secondary in the mix. As the discussion above reflects, by far the two dominant drivers of ACS's conclusion were the SCR reports, which came to ACS from professionals—Dr. Ranade, on August 13, 2018, and Glass, on August 28, 2018—associated with medical institutions other than Dr. Lupica's. *See id.* ¶¶ 79, 112. Both reports had been made *before* Dr. Lupica had a discussion with Rodriguez on August 30, 2018. *Id.* ¶¶ 79, 112, 120. And Dr. Lupica had not catalyzed or caused these other institutions to act. Nor did she contact ACS on August 30; Rodriguez initiated contact with Dr. Lupica. *Id.* ¶¶ 120, 122–23. Dr. Lupica had not suspected

child abuse based on her examination on August 8, 2018, *id.* ¶ 62, and she had not contacted

ACS that day, *id.* ¶ 63. Put differently, even if Dr. Lupica's confirmatory opinion were removed

from the equation, the independent evidence gave ACS clear probable cause on which to pursue

removal based on suspected abuse.

Accordingly, even assuming *arguendo* that the parents had a nonspeculative evidentiary

basis on which to argue that Dr. Lupica had initiated the prosecution by expressing a false—that

is, not sincerely held—opinion that A.K. had been the victim of child abuse, the parents'

malicious prosecution claims against the Medical Defendants would fail on a separate ground—

the existence of probable cause for the removal proceeding.

Accordingly, the Court enters summary judgment in favor of the Medical Defendants on

the state-law malicious prosecution claim.

### C.    Medical Malpractice

The parents bring a state-law medical malpractice claim, based on the theory that Dr.

Lupica actionably failed to diagnose the femur fracture on A.K.'s initial visit to the Weill Cornell

ED, against the Medical Defendants. The Court denies that motion, finding that material

disputes of fact, including competing expert testimony, preclude summary judgment.

#### 1.    Applicable Law

"To establish a claim for medical malpractice under New York law, a plaintiff must

prove (1) that the defendant breached the standard of care in the community, and (2) that the

breach proximately caused the plaintiff's injuries." *I.M. v. United States*, No. 16 Civ. 7608

(KMK), 2019 WL 316388, at *19 (S.D.N.Y. Jan. 24, 2019) (quoting *Lettman v. United States*,

No. 12 Civ. 6696 (LGS), 2013 WL 4618301, at *3 (S.D.N.Y. Aug. 29, 2013)). "It is well

established in New York law that 'unless the alleged act of malpractice falls within the

competence of a lay jury to evaluate, it is incumbent upon the plaintiff to present expert

testimony in support of the allegations to establish a prima facie case of malpractice.'" *Sitts v. United States*, 811 F.2d 736, 739 (2d Cir. 1987) (quoting *Keane v. Sloan–Kettering Inst. for Cancer Res.*, 464 N.Y.S.2d 548, 549 (1983)); *see also Gibson v. D'Amico*, 97 A.D.2d 905, 906–07 (1983); *Monahan v. Weichert*, 82 A.D.2d 102, 107 (1981).

A defendant "moving for summary judgment dismissing a complaint alleging medical malpractice must establish, *prima facie*, either that there was no departure [from the standard of care in the community] or that any departure was not a proximate cause of the plaintiff's injuries." *Gillespie v. N.Y. Hosp. Queens*, 96 A.D.3d 901, 902 (2012); *see also Taylor v. Nyack Hosp.*, 18 A.D.3d 537, 538 (2005) ("In a medical malpractice action, the party moving for summary judgment must make a *prima facie* showing of entitlement to judgment as a matter of law by showing the absence of a triable issue of fact as to whether the defendant physician was negligent."). The moving party's burden "can be met by the submission of affidavits and/or deposition testimony and medical records which rebut plaintiff's claim of malpractice with factual proof." *McFarland v. United States*, No. 12 Civ. 5162 (SJF) (SIL), 2014 WL 6389589, at *5 (E.D.N.Y. Nov. 14, 2014). Once the moving defendant has made such a showing, "the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact, but only as to the elements on which the defendant met the *prima facie* burden." *Gillespie*, 96 A.D.3d at 902 (internal citations omitted); *see Stukas v. Streiter*, 83 A.D.3d 18, 30 (2011).

"An expert opinion offering only conclusory and speculative assertions is insufficient." *Hersko v. United States*, No. 13 Civ. 3255 (JLC), 2017 WL 1957272, at *6 (S.D.N.Y. May 11, 2017). Expert opinions will not be considered "speculative or conclusory" when the opinions "address specific assertions made by the movant's experts, setting forth an explanation of the reasoning and relying on specifically cited evidence in the record." *Tsitrin v. N.Y. Cmty. Hosp.*,

154 A.D.3d 994, 996 (2017) (internal quotation marks omitted). Additionally, where there are conflicting expert opinions, the granting of summary judgment is inappropriate. *See, e.g., Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 79 (2d Cir. 2002) (collecting cases); *Richardson v. City of New York*, No. 15 Civ. 543 (LAK) (AJP), 2015 WL 7752143, at *14 n.19 (S.D.N.Y. Nov. 18, 2015) (collecting cases); *Roca v. Perel*, 51 A.D.3d 757, 759 (2008) (conflicting expert opinions will raise credibility issues which "can only be resolved by a jury").

### 2. The Parties' Positions

The parents' medical malpractice claim is based on the alleged failure of Weill Cornell to diagnose A.K.'s femur fracture when her parents took her to that hospital's ED the night of August 8, 2018. The Medical Defendants move for summary judgment on the theory—reprising a debate noted above—that A.K. definitively had not incurred the femur fracture as of that date. They claim that medical records and expert opinion are dispositive on that point. Medical Defs. Mem. at 1. Relatedly, their medical expert—orthopedic surgeon Dr. Eric D. Fornari, M.D. ("Dr. Fornari")—attests that there is no basis to allege that a deviation from the standard of care took place, or that such proximately caused "A.K.'s femur fracture or purported subsequent injuries." *Id.* at 2; *see also* Dkt. 215 ("Fornari Decl.").

The parents counter that there is evidence that A.K. had the femur fracture at the time of her visit to the ED, and that their expert's opinion would give the jury a basis to find a deviation from the standard of care and its proximate causation of later injuries. As to the standard of care, there is lay eyewitness testimony, from parent Kakar, that Dr. Lupica did not perform a full-body exam. Dkt. 229, Ex. 1 at 11 (Kakar); *id.*, Ex. 2 at 18, 63, 170, 235 (same). The parents' medical expert—Michael Tunik, M.D. ("Dr. Tunik")—has opined that Dr. Lupica thus failed to perform an adequate physical exam of A.K., departing from the standard of care for a pediatric emergency medicine physician and causing the missed diagnosis of a femur fracture. Pl.

Medical Opp. at 10; *see* Dkt. 218, Ex. 18 ("Tunik Report") at 3.  As to proximate causation, Dr.

Tunik has opined that the delay in diagnosing A.K.'s femur fracture caused her injury by making

the fracture worse.  Pl. Medical Opp. at 19; *see also* Dkt. 229, Ex. 13 at 4.

### 3.   Analysis

In medical malpractice cases, courts commonly deny summary judgment where the

parties present conflicting expert opinions.  *See, e.g.*, *Tarqui v. United States*, No. 14 Civ. 3523

(KMK), 2017 WL 4326542, at *7 (S.D.N.Y. Sept. 27, 2017); *DiGeronimo v. Fuchs*, 957

N.Y.S.2d 167, 171 (2012); *Deutsch v. Chaglassian*, 896 N.Y.S.2d 431, 432 (2010); *Feinberg v.*

*Feit*, 806 N.Y.S.2d 661, 662 (2005); *Breitenbach v. United States*, No. 16 Civ. 00011 (NAM)

(CFH), 2018 WL 4119039, at *12 (N.D.N.Y. Aug. 29, 2018).  Here, the expert testimony is in

conflict on both disputed issues.  For the reasons below, this case merits adhering to the general

rule "that summary judgment is not authorized in a medical malpractice action where the parties

adduce conflicting opinions of medical experts."  *Severino v. Weller*, 48 N.Y.S.3d 60, 61 (2017).

#### *a.   Standard of Care*

The parties' experts differ first on whether Dr. Lupica and the staff at Weill Cornell

departed from accepted medical practice in diagnosing and treating A.K.

The Medical Defendants, movants here, have adduced evidence to make out a *prima*

*facie* case that A.K.'s treatment comported with the standard of care.  *See Gillespie*, 96 A.D.3d at

902.  In particular, their expert, Dr. Fornari, opines that "all of the medical care and treatment

[A.K.] received, while [at Weill Cornell's ED], was appropriate, conscientious and within the

standard of care."  Fornari Decl. ¶ 16.  According to Dr. Fornari, A.K. received a swift and

proper evaluation upon the ED presentation, which included taking a history of the nature and

mechanism of the injury.  She was appropriately triaged, *id.* ¶ 18, did not show pain on various

assessments and associated scales, *id.* ¶¶ 18, 22, and received a "complete physical examination"

40

including of "all four extremities" from Dr. Shaykh, *id.* ¶ 19, all before she was seen by Dr. Lupica. Dr. Lupica then "assessed [the] patient from head to toe, based upon the findings indicated in the note," *id.* ¶ 24, "which contains great detail regarding her assessment and physical examination of A.K," *id.* ¶ 23. And "the documentation"—the contemporaneous records made by Dr. Lupica and others—"inherently reflects that Dr. Lupica performed both a primary and secondary trauma survey." *Id.*

Important to Dr. Fornari's assessment, although a CT scan of A.K.'s head was performed, "[t]here was no indication for any other imaging to be performed, given that a physical examination (performed by both [Dr. Shaykh] and [Dr. Lupica]) yielded normal findings[,] and the infant did not appear to be in any apparent distress." *Id.* ¶ 26. "At no point in time were there any abnormal findings documented on the vital signs by the nurses nor were there any abnormalities of the lower extremities documented." *Id.* ¶ 28. Dr. Fornari therefore opines that not only was Weill Cornell's diagnosis and treatment of A.K. on August 8 proper and consistent with the standard of care, *id.* ¶ 12—but also, in light of the negative findings from Weill Cornell's testing, there was no "transverse subtrochanteric femur fracture in A.K. during her four-hour ED presentation," *id.* ¶ 38.

With the Medical Defendants having demonstrated a *prima facie* entitlement to judgment as a matter of law via their evidence that they did not depart from "good and accepted practice," the burden then shifts to the parents to raise a triable issue of fact. *DiGeronimo*, 957 N.Y.S.2d at 171. They do so, substantially on the basis of the report of their expert, Dr. Tunik, who departs from Dr. Fornari's assessment in all significant respects. Dr. Tunik opines, "with a reasonable degree of medical certainty," that "there was an inadequate assessment of A.K. on secondary survey (with no detailed chart documentation), and there was a failure to perform an adequate

exam (including removal of all clothing) and assess the appearance of the extremities, deformation of extremity length and shape, range of motion, pain on palpation and pain on movement. These failures were a departure from the standard of care of a Pediatric Emergency Medicine physician, and directly led to a missed diagnosis of a femur fracture in the left lower extremity during the NYPD ED presentation." Tunik Report at 3.

The dueling expert opinions, each presumptively admissible, prevent entry of summary judgment in the Medical Defendants' favor on whether their diagnosis and treatment of A.K. comported with the standard of care. In Dr. Fornari's view, the absence of a femur fracture— and the lack of need to specifically test for such—was apparent from the infant's presentation. Such "is an extremely obvious injury, particularly in a two-month[-]old infant," Fornari Decl. ¶ 31, and had a femur fracture had been present, A.K. would have shown "significant pain" during the physical examination, as well as during her neurologic exam, *id.* ¶ 21. But all tests, and their results, were "unremarkable." *Id.* In Dr. Tunik's view, these normal tests are of no consequence, and more was needed, because "[t]he clinical presentation of a femur fracture in a two-month-old infant may not be obvious, especially immediately after the injury." Tunik Report at 3. That A.K. "was noted to have been moving all extremities throughout the course of the ED presentation," and "the finding that the extremities were warm and well perfused does not demonstrate the absence of a long bone fracture." *Id.* In his experience, having "personally examined dozens of infants that subsequently were identified as having femur fractures after blunt traumatic events," "[s]ome of these infants did not have clear evidence of swelling, bruising or grossly decreased movement of the lower extremity." *Id.* Thus, Dr. Tunik opines,

further examination of A.K. was needed, including "surveys [that] require fully undressing the infant and carefully examining all parts of the body for evidence of injury."[17] *Id.* at 2.

The Court accordingly finds that disputed issues of material fact on whether the Medical Defendants complied with the standard of care prevent entry of summary judgment for them. *Gillespie*, 96 A.D.3d at 902. This issue must be resolved by the factfinder at trial.

*b.    Proximate Cause*

Pursuant to a stipulation between the parties, *see* Dkt. 218, Ex. 19, the only expert evidence on the issue of probable cause is from plaintiffs' expert, Dr. Tunik. "Where, as here, the plaintiff[s] allege[] that the defendant[s] negligently delayed in diagnosing and treating a condition, proximate cause may be predicated on the theory that the defendant[s] 'diminished [the patient's] chance of a better outcome or increased the injury.'" *D.Y. v. Catskill Reg'l Med. Ctr.*, 66 N.Y.S.3d 368, 371 (2017) (quoting *Wolf v. Persaud*, 14 N.Y.S.3d 601 (2015)) (cleaned up).

Relevant to the issue of proximate cause, Dr. Tunik opines that Dr. Lupica's "failure to promptly immobilize the fracture caused the infant to experience additional pain, and very likely

---

[17] Beyond these divergent expert opinions as to what the standard of care required of Dr. Lupica and her colleagues, the experts' reports also reflect a factual difference as to whether Dr. Lupica's examination of A.K. entailed removal of the infant's clothing. Based on Dr. Fornari's review of the records of the examination, "Dr. Lupica assessed this patient from head to toe, based upon the findings indicated in the note. She began her examination of the infant at the top of her head and continued through the eyes, ears, nose, throat, chest, abdomen and all four extremities." Fornari Decl. ¶ 24. Dr. Fornari opines that, to assess the range of motion, and to assess capillary refill and pulse values necessarily entailed such a full-body physical examination, *id.*, which Dr. Lupica could not have performed unless she "observe[d] the child's body, without clothing," *id.* ¶ 33. Dr. Tunik interprets the records differently—as bespeaking "a failure to perform an adequate exam (including removal of all clothing)." Tunik Report at 3. Based on his review of the records and the testimony of the parents, who were present during Dr. Lupica's examination, he concludes that "[t]he infant's clothes were never actually removed" because when Dr. Lupica attempted to remove clothes, the "screaming increased," and Dr. Lupica ceased removing clothing in response. *Id.* at 2.

43

made the condition of her fracture worse." Tunik Report at 4. Specifically, "the failure to diagnose a femur fracture . . . caused a lack of immobilization of the [l]eft [l]ower [e]xtremity, which in turn very likely caused the fracture to become worse, and more angulated, as a result of normal manipulation by her caregivers during the night." *Id.* at 5. Dr. Tunik also articulates his opinion of what would have happened differently had the Medical Defendants met the standard of care: "Had they timely diagnosed the femur fracture, they would have immediately immobilized the fracture and A.K. would have been placed in a protective harness, thereby limiting her movement, and precluding her from sustaining any further damage to the injured area." *Id.*

Based on this expert testimony, a juror could rationally conclude that defendants' alleged failure to fully examine A.K.'s legs (and order imaging to confirm or deny a possible break) "caused the child's underlying condition to remain undetected and unnecessarily worsen . . . , thereby resulting in continued emotional and physical pain and suffering relating to the child's underlying condition." *D.Y.*, 66 N.Y.S.3d at 372; *see also Dockery v. Sprecher*, 891 N.Y.S.2d 465 (2009). Such a conclusion would satisfy proximate cause. And even if a juror accepted defendants' argument that A.K.'s femur break did not worsen in the approximately 5.5 hours before she was diagnosed at Sinai, "he or she could still rationally conclude that the failure to expand the diagnosis and order an earlier [x-ray] caused the child to, at a minimum, endure unnecessary pain and suffering while [s]he awaited a diagnosis and treatment that would fully address h[er] underlying condition and symptoms." *D.Y.*, 66 N.Y.S.3d at 372. This conclusion, too, under New York law, would suffice for proximate cause. And while Dr. Tunik does not "quantify the extent to which the delayed diagnosis and treatment diminished the chance of a better outcome or increased the injury," he need not do so—such "is not fatal to the

establishment of proximate cause, so long 'as evidence is presented from which the jury may

infer that the defendant[s'] conduct diminished the [patient's] chance of a better outcome or

increased his [or her] injury.'" *Id.* at 371 (quoting *Flaherty v. Fromberg*, 849 N.Y.S.2d 278

(2007)) (cleaned up).

Plaintiffs meet the *prima facie* burden by adducing sufficient evidence, via Dr. Tunik's

expert testimony, for a jury to decide upon in their favor. "Given the unique nature of the

inquiry in each case, it is for the finder of fact to determine legal cause, once the court has been

satisfied that a *prima facie case* has been established." *Derdiarian v. Felix Contracting Corp.*,

51 N.Y.2d 308, 315 (1980). Ultimately, "[t]the issue of whether a doctor's negligence is more

likely than not a proximate cause of a plaintiff's injury is usually for the jury to decide." *Polanco*

*v. Reed*, N.Y.S.2d 57, 58 (2013) (alteration and internal quotation marks omitted); *see also A.B.*

*by Alverez v. United States*, No. 16 Civ. 2554 (LMS), 2019 WL 10302175, at *9 (S.D.N.Y. Apr.

17, 2019) ("If the proof is ambivalent as to the issue of whether the plaintiff would have suffered

the same outcome regardless of the malpractice, then a 'pure factual issue is raised' that can

'only be resolved by a jury determination of whether the malpractice proximately deprived the

[injured party] of [a] substantial possibility' of a better outcome." (alterations in original)

(internal quotation marks omitted)). Accordingly, the Medical Defendants' motion for summary

judgment on the medical-malpractice claim is denied.

## CONCLUSION

For the foregoing reasons, the Court (1) grants in full the ACS Defendants and City's

motion for summary judgment, and (2) grants in part and denies in part the motion for summary

judgment by the Medical Defendants, entering summary judgment in their favor on the malicious

prosecution state-law claim, and denying summary judgment on the medical malpractice claim.

The Court also dismisses the John Doe defendants without prejudice.

This case will now proceed to trial on the single outstanding claim against Dr. Lupica and Weill Cornell.  The Court directs the parties promptly to confer, and by April 18, 2023, to submit a detailed and complete joint pretrial order consistent with the Court's Individual Rules governing jury trials.  Any motions *in limine* are due on the same date as the joint pretrial order; opposition briefs are due one week later.

The Clerk of Court is respectfully directed to terminate all pending motions.


SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: March 27, 2023
      New York, New York